**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 19-548** |
| **DIMITRE HADJIEV** | |
| **Defendant.** | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON**
**MOTION TO SUPPRESS ALL STATEMENTS GIVEN BY DEFENDANT**

Rufe, J.                                                                                    April 23, 2021

Defendant Dimitre Hadjiev is charged in a 24-count Second Superseding Indictment

with: Count 1, money laundering; Count 2, failure to file a record of a financial transaction;

Counts 3 and 24, structuring a transaction to evade reporting requirements; Count 4, trafficking

in counterfeit goods; and Counts 5 through 23, structuring a transaction to cause a financial

institution to fail to file a Currency Transaction Report.[1]

Defendant alleges that his constitutional rights were violated when he was interrogated by

law enforcement officials on August 22, 2019, after his arrest. As a result, Defendant moves to

exclude the video recording, the audio recording, the transcripts, and all evidence flowing from

the interrogation.[2] Upon consideration of Defendant's Motion to Suppress, the government's

response thereto, and the evidence, testimony, and oral argument presented at the evidentiary

hearing, the Court now enters its findings of fact and conclusions of law.

---

[1] *See* Second Superseding Indictment [Doc. No. 122].

[2] Doc. No. 137 at 1.

## I.    FINDINGS OF FACT

1. Defendant Dimitre Hadjiev is a native of Bulgaria, and the Federal Bureau of Investigation ("FBI") and Philadelphia Police Department agents involved in this investigation were aware of that fact.[3]

2. English is not Hadjiev's first language, and the agents involved in this investigation also knew that Hadjiev was not a native English speaker.[4]

3. Hadjiev first came to the United States in 2000 on a student visa to attend Delaware County Community College.[5]

4. Hadjiev has lived in the United States for over 20 years and owns and operates a retail business, Dimitre's Jewelry and Watches, on South Street in Philadelphia.[6]

5. On August 20, 2019, a criminal complaint was filed under seal, and an arrest warrant was issued.[7]

6. On August 22, 2019, Hadjiev was arrested at his jewelry store and transported to the FBI facility in Philadelphia where he was interrogated. Hadjiev was interrogated by FBI Task Force Officer John Benham,[8] FBI Special Agent James Finnegan, and FBI Special Agent Lauren Almanzor.[9] The interrogation began at 12:25 p.m. and ended at

---

[3] Doc. No. 137 ¶¶ 1–2; Doc. No. 140 ¶¶ 1–2.

[4] Doc. No. 137 ¶ 5.

[5] Doc. No. 137 ¶ 4; Doc. No. 140 ¶ 4.

[6] Doc. No. 140 ¶¶ 4–5.

[7] *See* Doc. No. 1.

[8] Officer Benham is employed by the Philadelphia Police Department and assigned to the FBI Violent Crimes Taskforce. Doc. No. 154 at 33.

[9] Special Agent Almanzor joined part-way through the interrogation.

2:47 p.m., lasting two hours and twenty-two minutes.[10] The interrogation was video recorded, and a transcript was prepared.[11]

7.      Before reading Hadjiev his *Miranda* warnings, Benham explained to Hadjiev that the interrogation would be about "purchasing stolen watches off the street[,] . . . money laundering, structuring from the IRS. And there's some other stuff, possibly some overseas stuff."[12] During this explanation, Benham asked no substantive questions.[13]

8.      Officer Benham read Hadjiev his *Miranda* warnings from a form and asked Hadjiev "Do you understand that?" Hadjiev answered "Yeah." Benham then asked Hadjiev to read and sign the *Miranda* waiver form. Hadjiev began to read through the *Miranda* form, but stopped and asked to see his arrest warrant, which was written in English. Hadjiev read the warrant and asked no questions about it. He then went back to the *Miranda* waiver form, looked it over, and signed it.[14]

9.      After Hadjiev signed the waiver form, Benham and Finnegan interrogated Hadjiev about the buying and selling of stolen watches. They also questioned him about the alleged structuring of financial transactions.[15] Hadjiev responded to the questions in English and generally maintained that he did not remember buying any stolen watches, and if he did, he did not know that they were stolen.

---

[10] Doc. No. 137 ¶ 6; Doc. No. 140 at 20.

[11] Doc. No. 154 at 34, Doc. No. 140-1. The parties agreed at the hearing that the video and transcript are accurate representations of the interrogation. A copy of the video was provided to the Court and reviewed in Chambers.

[12] Doc. No. 140-1 at 1.

[13] The government is not seeking to introduce any statements made by Defendant prior to the *Miranda* warnings. *See* Doc. No. 166 at 13.

[14] *Id.* at 4–5; *see also* Doc. No. 154 at 34.

[15] Doc. No. 140-1 at 8–34.

10.  Almanzor joined the interrogation midway through and asked Hadjiev questions about his allegedly fraudulent marriage. Almanzor told Hadjiev that Hadjiev's wife had revoked the petition that she made on Hadjiev's behalf for him to become a citizen, and that Hadjiev was "out of status" and could be deported.[16] Almanzor also explained that Hadjiev likely would be deported "regardless of what happens with the criminal case, because they have nothing to do with each other."[17]

11.  At points in the interview, Hadjiev requested clarification as to the questions that had been asked. For example, he asked for clarification when the agents asked if he purchased watches within the last six months and when the agents told him that he had purchased a watch from a customer the previous May.[18] The requests for clarification were to gain information from the agents and to fully understand the questions being asked. At no point did Hadjiev ask for clarification because he didn't understand the language or words being used.

12.  Throughout the interrogation, the agents suggested that Hadjiev could cooperate with them, and that it would be beneficial for him to do so. The agents suggested that if Hadjiev was truthful and cooperated, they would be able to help him get house arrest and a reduced sentence. Benham stated: "but what I can do is work with you and work with the U.S. Attorney and work with everybody else" and "we can tell the judge, hey, he did this, this, this and this, and he helped us with this, this and this."[19]

_____

[16] *Id.* at 38.

[17] *Id.* at 52.

[18] *Id.* at 8–14.

[19] *Id.* at 24.

Almanzor also told Hadjiev that because he was no longer legally in the country and could be deported, "your only saving grace is to essentially decide to talk" to the agents.[20]

13.   Multiple times in the interrogation, Hadjiev asked the agents about the specifics of making a deal or cooperating. He asked: "So I understand you want me to be 100 percent honest, but what's -- what's my deal?"[21] and "I just want to know what type of deal I'm going to get. If I really know, I'll tell you."[22] Hadjiev also requested promises or guarantees in writing; he asked "What can I have in writing from you that you will guarantee me --"[23]

14.   Each time Hadjiev asked for a promise, guarantee, or deal, the interrogating agents stated that they could not make him one. Almanzor stated: "We are not in a position as agents to promise you things, and we shouldn't be allowed to promise you things, because that's not how we work."[24] Benham stated: "Well, I can't guarantee that right now, but if you -- if you work with us, I can work with you. I can't make you -- I can't promise -- I can never promise you anything. I can't promise you anything, but what I can do is work with you and work with the U.S. Attorney and work with everybody else."[25]

---

[20] *Id.* at 38.

[21] *Id.* at 23.

[22] *Id.* at 34.

[23] *Id.* at 38.

[24] *Id.* at 34.

[25] *Id.* at 24.

15.  Hadjiev understood that the interrogating agents could not make him any promises or guarantees. He stated "[b]ut I know you cannot promise me that," and that the agents could not guarantee  him that he would serve no sentence.[26] Hadjiev also stated that he was not inclined to cooperate because the agents could not promise him that he would not be deported, stating: "but you still not giving me guarantee that I won't be deported if I do cooperate."[27]

16.  Two hours and four minutes into the interrogation, Hadjiev requested counsel. He stated: "Okay. I will take my lawyer."[28] Almanzor immediately acknowledged his request.[29]

17.  Despite requesting counsel, Hadjiev continued to ask the agents questions. Almanzor confirmed with Hadjiev that he was comfortable asking questions and having the agents respond, despite his request for counsel. She stated: "But before we keep talking, a few minutes ago you said you wanted an attorney. I just want to make sure right now you're asking me the question -- . . . -- and you feel comfortable with me explaining to you and us still having a conversation."[30]

18.  For approximately thirteen minutes after his request for counsel, Hadjiev asked questions. He asked about the cooperation process, house arrest, and if everything

---

[26] *Id.* at 70.

[27] *Id.* at 62.

[28] *Id.* at 95.

[29] *Id.*

[30] *Id.* at 97.

could "go away" if he made a deal to leave the United States and return to Bulgaria.[31] There was no substantive discussion of the charges, and the agents largely repeated what they had already said to Hadjiev prior to him invoking counsel. The agents did not ask substantive questions during this period and did not attempt to elicit statements from Hadjiev. However, Hadjiev offered that he was in "a good fake marriage, to be really honest."[32] Hadjiev's questions ended when the agents got up to leave and Hadjiev requested to use the restroom.

19.   After going to the restroom, Hadjiev was brought back to the room, offered food, and then sat in silence for approximately two minutes. Almanzor then entered the room and explained to Hadjiev that the interrogation was over because he had invoked his right to counsel, and they would begin processing him. While Almanzor was explaining that the interrogation had ended, and that the agents would no longer talk with him, Hadjiev interrupted and said, "and I'm not here for you to feel bad for me because you're right, I did this thing."[33]

20.   At the suppression hearing, Benham testified that he read Hadjiev his *Miranda* rights, Hadjiev voluntarily signed the waiver, and that there was not a "language barrier" between the agents and Hadjiev.[34]

21.   Benham's testimony is consistent with the videotape and the transcript and the Court finds it credible.

---

[31] *Id.* at 103.

[32] *Id.* at 104.

[33] *See* Interrogation Video at 2:21:40–2:26:01.

[34] Doc. No. 154 at 34–35.

22.    Based on the video and transcript of the interrogation, Benham's testimony, and

Hadjiev's appearances before the Court, the Court finds that Hadjiev is comfortable

reading, speaking, and understanding English, and is competent in the use of the

English language.

## II.    DISCUSSION

Defendant asserts that the interrogation was in violation of "the Fourth Amendment, Fifth

Amendment, *Miranda v. Arizona*, the Sixth Amendment, and the Fourteenth Amendments to the

Constitution, as well as Fed. R. Evid. 410."[35] Defendant presents three arguments: 1) Hadjiev did

not knowingly and voluntarily waive his *Miranda* rights;[36] 2) Hadjiev's statements were

involuntary because the agents improperly promised him his freedom or that he could remain in

the United States if he admitted to his alleged crimes;[37] and 3) the interrogating agents entered

into inadmissible plea negotiations with Mr. Hadjiev, and therefore his statements are

inadmissible under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11.[38]

### A.  Defendant knowingly and voluntarily waived his *Miranda* rights

To establish that Defendant waived his *Miranda*[39] rights, the government must show: (1)

that the relinquishment of the defendant's rights was voluntary; and (2) that the defendant was

fully aware that he was waiving his rights and of the consequence of such waiver.[40] The Court's

evaluation of whether there was a valid waiver is context-specific and must consider the entire

---

[35] Doc. No. 137-1 at 1.

[36] *See id.* at 3–6.

[37] *See id.* at 1–2.

[38] *See id.* at 7–8.

[39] 384 U.S. 436 (1966).

[40] *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).

course of conduct by the police in obtaining the statement.[41] Defendant argues that he "lacked the requisite level of comprehension to make a knowing waiver of his rights."[42] The Court construes Defendant's argument to be that he did not understand the *Miranda* warnings because he is a non-native English speaker.[43]

The video recording shows that Defendant was read the *Miranda* warnings from a form. Defendant was then given that form to sign. He began to read the *Miranda* form and asked to see his arrest warrant. He read his arrest warrant, which was written in English, finished reviewing the *Miranda* form, and signed the waiver of rights. He asked no questions about the *Miranda* warnings and gave no indication that he did not understand the warnings.

Defendant came to the United States on a student visa to attend Delaware County Community College. He has been in the United States for over 20 years and runs a jewelry and watch shop on South Street in Philadelphia. Benham testified at the hearing that, during the interrogation, there was no "language barrier,"[44] and the video and transcript demonstrate that Defendant has no difficulty reading, speaking or comprehending English. The Court finds that Defendant understood the *Miranda* warnings he was given and relinquished his rights voluntarily and knowingly in writing with full awareness of his actions. Additionally, the interrogation ended when Defendant invoked his right to counsel.[45] Defendant's exercise of his rights further

---

[41] *Id.*

[42] Doc. No. 137-1 at 4.

[43] *See, e.g.*, Doc. No. 137 ¶ 28 ("The agents could have provided a Bulgarian translation of the *Miranda* waiver. They did not.").

[44] *See* Doc. No. 154 at 34–35.

[45] Doc. No. 140-1 at 95 ("Okay. I will take my lawyer."). Defendant's post-assertion statements are considered to be involuntary and are inadmissible. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

suggests that understood his *Miranda* rights and knowingly and voluntarily waived them at the start of the interrogation.

Defendant argues that he did not knowingly waive his *Miranda* rights because he "asks for clarification throughout the video" and speaks with an accent.[46] The Court finds that the video and transcripts do not support this argument. For example, Defendant claims that he was confused about a question asking if he had purchased a stolen watch in May, when he said "May? Bought one?"[47] The full context of this exchange shows that Defendant's questions were seeking clarification of the agents' accusations.[48] The interrogation, as well as Defendant's appearances before the Court, show that Defendant reads, speaks, and understands English. He would have understood his *Miranda* rights when they were read to him and he read the form.[49]

---

[46] Doc. No. 137-1 at 4–5.

[47] *See* Doc. No. 137 ¶ 14.

[48] *See* Doc. No. 140-1 at 13–14.

> DIMITRE HADIJEV [*sic*]: You are talking about such a long time.
> JOHN BENHAM: No. This is May -- I think May was the last time that you bought one.
> DIMITRE HADIJEV[*sic*]: In May?
> JOHN BENHAM: Uh-huh.
> DIMITRE HADIJEV[*sic*]: Bought one?
> JOHN BENHAM: No. It was four or five. You had to leave the store. You got in an Uber and you went up to the bank. . .
> JOHN BENHAM: You went up there, got money, came back from the bank, and then you paid the guy for the watches.
> DIMITRE HADIJEV[*sic*]: In May?
> JOHN BENHAM: I don't know the exact day when it was.
> DIMITRE HADIJEV[*sic*]: No.
> JOHN BENHAM: It was in the last six months.
> DIMITRE HADIJEV[*sic*]: Okay. But if that -- if that happen, I don't remember it happening.

[49] Defendant further argues that his Sixth Amendment right to counsel attached when the criminal charges were filed and so he also had a Sixth Amendment right to counsel during the interrogation. Doc. No. 137-1 at 8. Defendant's waiver of his *Miranda* rights also waived his Sixth Amendment rights. *See Patterson v. Illinois*, 487 U.S. 285, 296, (1988) (citations omitted) ("[A]n accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").

**B. Defendant was not improperly promised his freedom and the interrogation was not a plea agreement negotiation**

Defendant next argues that his statements were not voluntary because the interrogating agents made false promises that he would be set free if he confessed.[50] But an interrogator suggesting that a Defendant would benefit from providing truthful answers and making statements "of possible lenience" does not violate *Miranda*.[51] Defendant asked the FBI agents multiple times about the specific promises and guarantees that they could give him,[52] and each time the agents responded that they could not make him any.[53] Defendant understood that the agents could not make him any promises, and acknowledged that fact.[54] Because the agents made no false promises, Defendant's statements cannot have been rendered involuntary.

Defendant also argues that the interrogation was a plea agreement negotiation and is inadmissible under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). To determine if a statement was made during a plea negotiation, a court considers "whether it

---

[50] *See* Doc. No. 137-1 at 2; *see also United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) ("It has been recognized nevertheless that unfulfillable promises or certain other misrepresentations made to a suspect might render a confession involuntary because they overcome his desire to remain silent.").

[51] *United States v. Duprey*, No. 11-434-54, 2013 WL 1401786, at *3 (E.D. Pa. Apr. 8, 2013); *see also United States v. Falciglia*, 421 F. App'x 146, 147 (3d Cir. 2008) ("Our sister courts of appeals are uniform in holding that an officer may indicate that the defendant's statements could bring about leniency without violating *Miranda*.").

[52] *See* Doc. No. 140-1 at 23 ("So I understand you want me to be 100 percent honest, but what's -- what's my deal?"); *id.* at 24 ("But what is -- what -- what are you giving me in return? Are you going to give me my freedom?"); *id.* at 34 ("I just want to know what type of deal I'm going to get. If I really know, I'll tell you."); *id.* at 38 ("What can I have in writing from you that you will guarantee me --").

[53] *See, e.g.*, Doc. No. 140-1 at 24 ("Officer Benham: Well, I can't guarantee that right now . . ."); *id.* at 34 ("Agent Finnegan: We can't promise that."); *id.* at 39 ("Agent Almanzor: . . . We are not in a position as agents to promise you things, and we shouldn't be allowed to promise you things, because that's not how we work. "); *id.* at 49 ("Officer Benham: . . . I can't make promises, but we -- that's something we can talk about."); *id.* at 51 ("Agent Almanzor: . . . We cannot make you promises. We cannot tell you how it's going to go, nothing like that."); *id.* at 65 ("Agent Almanzor: We can't make promises. Officer Benham: I'm not going to promise you. I can't promise you any guarantees."); *id.* at 82 ("Agent Finnegan: Okay. I know you talked about promises, and I'm not making -- I'm not here to make you promises."); *id.* at 90 ("Agent Almanzor: . . . We can't make you any promises.").

[54] *Id.* at 70.

was reasonable for the defendant to consider the communication part of a plea discussion given the totality of the objective circumstances."[55] There were no promises or guarantees made by the interrogating agents, and they repeatedly said that they did not have the authority to make any. It would not have been reasonable for Defendant to consider the interrogation to be part of a plea discussion.[56]

### III. CONCLUSIONS OF LAW

1. Hadjiev knowingly and voluntarily waived his *Miranda* rights through having the *Miranda* waiver form read to him, reading the form himself, and signing it.

2. The interrogating agents made no impermissible promises to Hadjiev.

3. Hadjiev could not reasonably have believed that the interrogation was part of plea agreement negotiations.

4. The interrogation ended when Hadjiev stated: "Okay. I will take my lawyer," and no statements made thereafter are admissible.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress will be denied. An order will be entered.

---

[55] *United States v. Krohn*, No. 18-391, 2020 WL 3405722, at *3 (M.D. Pa. June 19, 2020).

[56] Defendant also argues that the length of the interrogation is "a factor that should be considered by this Court." Doc. No. 137-1 at 6–7. Defendant's interrogation lasted two hours and twenty-two minutes. An interview of that length is not inherently coercive, and Hadjiev was offered food and water. *Cf. Ashcraft v. Tenn.*, 322 U.S. 143, 153 (1944) (holding that a 36-hour interrogation is inherently coercive).