UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :   Case No. 2:19-cr-00548-CMR-1
                           :
        v.                 :   January 11, 2022
                           :
DIMITRE HADJIEV,           :   10:35 a.m. – 11:30 a.m.
                           :
          Defendant.       :
. . . . . . . . . . . . . .:

TRANSCRIPT OF PRETRIAL MOTIONS HEARING
(HELD VIA VIDEO CONFERENCE)
BEFORE THE HONORABLE CYNTHIA M. RUFE
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Government:        K.T. NEWTON, AUSA
                          U.S. ATTORNEY'S OFFICE
                          615 Chestnut Street
                          Suite 1250
                          Philadelphia, PA 19106

For the Defendant:        DANIEL L. CEVALLOS, Esq.
                          CEVALLOS & WONG LLP
                          61 Broadway
                          Suite 2220
                          New York, NY 10006

Court Recorder:           Inna Goldshteyn


Transcription Service:    Hunt Reporting Company
                          12 Crain Hwy. N #2
                          Glen Burnie, MD 21061


Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1                          I N D E X

2    RECORD OF PROCEEDINGS                              PAGE

3                                                        3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    THE COURT:  Okay.  So we will open
 3    court.  Good morning, everyone.
 4                    MS. NEWTON:  Good morning, Your Honor.
 5                    MR. CEVALLOS:  Good morning, Your
 6    Honor.
 7                    THE DEFENDANT:  Good morning.
 8                    THE COURT:  And is our stenographer
 9    ready?  Hello?  Very good, Inna.  Thank you very much.
10    We're ready to address this.  I see faces on the
11    screen.  I want to clarify who is on this record and
12    participating today.  I see the prosecutor, Ms.
13    Newton.
14                    MS. NEWTON:  Good morning, Your Honor.
15                    THE COURT:  Happy New Year.
16                    MS. NEWTON:  Same to you.
17                    THE COURT:  And I see Mr. Cevallos.
18                    MR. CEVALLOS:  Good morning, Your
19    Honor.
20                    THE COURT:  Good morning.  And
21    congratulations.  I hope everything went well.
22                    MR. CEVALLOS:  Yes.  Thank you, Your
23    Honor.  Yes.  My daughter's now about a month old.
24    So, yes, everything went well.  Except, of course,
25    which the Court may or may not know that the other one
```

1   was diagnosed with COVID so we've been quarantined

2   which I notified the government last week.

3              THE COURT:  The other one who?

4              MR. CEVALLOS:  My daughter.  My other

5   daughter.

6              THE COURT:  Your other daughter.  The

7   other one, you said.  Well, that's no fun.  But you

8   have a fake background then because you're not sitting

9   in the back of the courtroom?

10             MR. CEVALLOS:  Candidly, Judge, if my

11  real background was on, it would be a dresser with

12  clothes falling out of it.  So I would like to create

13  the illusion that I am competent, if not the reality.

14             THE COURT:  One thing we don't do with

15  these is audio record.  We are video -- I mean we

16  audio record, we don't video record these proceedings,

17  similar to a Zoom, but we're not visually recording

18  and there's no jury here.  So I don't think you have

19  to worry about it.  I've seen some very interesting

20  bedrooms is what I'll say.  I'm always wondering how

21  in the world very good lawyers can sit in a bedroom

22  and do a Zoom.  I just don't get it.  But -- and I

23  will never forget it either.

24             But, let's see, there is someone here

25  who's got the background of a jewelry store.  I take

1   that to be our defendant, Mr. Hadjiev.

2                    THE DEFENDANT:  Correct.

3                    THE COURT:  Good morning.  Happy New

4   Year.

5                    THE COURT:  Happy New Year.  Are there

6   any other participants on this feed?

7                    MS. NEWTON:  Not for the government,

8   Your Honor.

9                    THE COURT:  All right.

10                    MR. CEVALLOS:  Your Honor, there's no

11  one on the feed right now.  But if needed, as to one

12  of the motions, Mr. Hyman is available.  I've given

13  him the link.  And if needed, I can call him.  But

14  that's just a contingency, Your Honor.

15                    THE COURT:  All right.  That's good.

16  But none of your other co-counsel are present.  Is

17  that correct?

18                    MR. CEVALLOS:  No, Your Honor.  And I

19  notified the Court of this that I would be handling it

20  and that Mr. Scuderi may be logging in.  He's got

21  court, I believe, in West Chester.  I could be wrong.

22  It might be Media.  I'm not entirely sure.  But the

23  point is, Your Honor, he will try to get in as soon as

24  possible.  I notified chambers and the government that

25  I would be handling it alone whether or not the other

1    two showed.

2              THE COURT:  That's fine.  Thank you.

3              So let's proceed.  As you know, and

4    this is all of record now, the government moved for a

5    continuance of trial due to COVID-related instances.

6    And it was not opposed by the defense.  And that was

7    approved and that is why we're meeting today to decide

8    how to handle the additional pretrial motions that

9    were filed from December to the present.  And I

10   believe this morning we received a response from Mr.

11   Cevallos concerning the government's motion, Mr.

12   Hyman.

13             MR. CEVALLOS:  Your Honor, not exactly.

14   Last night, I filed my response.  This morning, the

15   government filed a reply.  So, yes, in the last 24

16   hours, the Court has received my --

17             THE COURT:  I don't get --

18             MR. CEVALLOS:  -- response.

19             THE COURT:  -- e-mail -- I don't get

20   e-mail -- ECF e-mail at night.  So to me, I'm reading

21   it this morning, Mr. Cevallos.  I'm not --

22             MR. CEVALLOS:  Yes, Your Honor.

23             THE COURT:  -- complaining.  I'm not

24   being negative.  I'm not saying you filed this late.

25   But that's really unimportant and equivocal.  So let's

1    just move on.  I read it this morning and also the

2    government's reply to that response.  And we're ready

3    to address that.

4                But I have a few others that I'd like

5    to do seriatim and see if there's any consensus.  And

6    one of them -- two of them -- well, it's a bit

7    repetitious but because we have done these pretrial

8    motions so many times in anticipation of an actual

9    trial date for a jury trial, and then because of

10   COVID, maybe one other reason, had to continue the

11   trial again, here we are.  And some of this does sound

12   familiar to me.  So let's just handle this one by one.

13               Defendant's motion in limine to permit

14   reference to Defendant's nationality -- that's

15   recorded at the docket as number 202.  And I would

16   like to hear you out briefly on this.  It's your

17   motion, Mr. Cevallos, so please explain what you

18   expect to do in an opening.

19               MR. CEVALLOS:  Your Honor, in my

20   opening and throughout the case, I'm going to make

21   reference to the fact that Mr. Hadjiev is, in fact,

22   from Bulgaria.

23               THE COURT:  Well, the question is why.

24   What's relevant about it?

25               MR. CEVALLOS:  Your Honor --

```
 1                      THE COURT:  I'm not -- you know, you
 2       have to understand, it's been a long time since you've
 3       seen me but I'm no different.  I want to know why --
 4       how it is relevant.  And I'm not saying by asking you
 5       that question that it obviously is relevant.  It can
 6       be relevant for some things and not relevant for
 7       others.  What is your relevancy?
 8                      MR. CEVALLOS:  The relevancy is that
 9       Mr. Hadjiev is a native-speaking -- he's a native of
10       Bulgaria and he speaks Bulgarian as a first language.
11       So this is not an issue where I'm saying that Mr.
12       Hadjiev cannot speak English.  I've never said that.
13       Mr. Hadjiev can speak English.  However, a key
14       component of this case is going to be, at least as to
15       money laundering, whether or not the government or a
16       government agent represented to Mr. Hadjiev that a
17       watch was, in fact, stolen.
18                      Additionally at issue is going to be
19       for the structuring and the failure to file Form 8300s
20       is whether or not other bank employees, for example,
21       explained to Mr. Hadjiev regulations or not.  Mr.
22       Hadjiev, as you can -- well, as Your Honor has not
23       seen but in the videos recorded surreptitiously by the
24       government or -- you know, without Mr. Hadjiev knowing
25       about it, there are several representations that are
```

 1   made to Mr. Hadjiev.  The point in referring to him

 2   from Bulgaria is that I'm going to argue, not only in

 3   my opening but throughout the case, that Mr. Hadjiev

 4   is not familiar with slang, with phrases that we use

 5   in English and that they don't have any literal

 6   translation to Bulgarian.  And I think that, candidly,

 7   this is something the factfinder can discern from

 8   watching the video itself.

 9              The problem I see with the government's

10   response is, to me, evidenced in the response.  The

11   government says, well, if you're going to refer to him

12   being Bulgarian, prove it up because someone who

13   speaks Bulgarian with their family and has a thick

14   accent isn't necessarily from Bulgaria.  I just don't

15   think that's realistic, Your Honor.  I think you might

16   be able to find some exceptions, but 99 percent of the

17   time, someone with a thick accent who speaks another

18   language around their family is likely from another

19   country.  I'm not making any kind of societal

20   statement.  I think that's a reasonable assumption.

21              But -- and I would also add, Your

22   Honor, and I put this in my responses, to the extent

23   this is the government seeking to have the defense

24   disclose their litigation strategy, respectfully, I

25   object.  I know Your Honor doesn't see it that way.

1    Your Honor has asked me to explain the relevance.  But
2    the relevance, to me, is going to be not that Mr.
3    Hadjiev doesn't speak English.  He does speak English.
4    But the core of the money laundering sting count,
5    Count I, is that the government represented to him
6    that something was stolen.
7              And, Your Honor, I know you haven't had
8    the benefit of going through all the transcripts and
9    seeing the video but, Your Honor, I think it's very
10   relevant that the fact that Mr. Hadjiev speaks English
11   well enough to make some sales and do business, but
12   he's not familiar with colloquialisms, he's not
13   familiar with slang and that as a non-native English
14   speaker, this was more challenging.  It wasn't a
15   simple case of the government being able to just
16   represent what they wanted.  Or it wasn't a simple
17   case for structuring purposes for a bank employee to
18   just explain to him how American tax law works.  In
19   fact, the government's own witness is former
20   accountants, (indiscernible) Belonsky, says, and I
21   quote, "Dimitre just didn't understand U.S. tax law."
22   That's his own words.  And I think a large part of
23   that is that he's not somebody who grew up in the
24   system.  He's somebody who came to it late in life.
25              So I just would add, again, not arguing

1  he doesn't speak English.  Never argued that.  It's

2  that it is an important consideration for the jury to

3  recognize and take into account when making critical

4  determinations -- let me just -- I'm sorry, Your

5  Honor.  I should have said this at the front end.

6  Other than the counterfeiting count, almost -- I'm

7  sorry -- every other count in this indictment requires

8  some degree of knowledge by Mr. Hadjiev.  In other

9  words, this is not a case where you simply say --

10                THE COURT:  And what does that --

11                MR. CEVALLOS:  -- in America --

12                THE COURT:  -- have to do with where he

13  was born?

14                MR. CEVALLOS:  Pardon, Your Honor?

15                THE COURT:  The requirement that you

16  speak of has nothing to do with where he was born.  So

17  maybe you should complete your sentence or your

18  argument.

19                MR. CEVALLOS:  It's completed, Your

20  Honor.  I see Your Honor has --

21                THE COURT:  No, no.  Don't start that,

22  Mr. Cevallos.  Don't start --

23                MR. CEVALLOS:  I said I see Your Honor

24  understands.

25                THE COURT:  This is unbelievable that

1    you would come back after this time and pretend -- and

2    it is pretending -- that I don't review everything and

3    I don't know or don't want to know what you're talking

4    about.  When you say there's not one count here that

5    doesn't require intent, that's true except --

6                    MR. CEVALLOS:  That's not what I said,

7    Your Honor.

8                    THE COURT:  -- what does that have to

9    do with where he's from or whether he has an accent?

10                   MR. CEVALLOS:  No, Your Honor.  That's

11   actually not what I said.  What I said was other than

12   the counterfeiting, these regulatory crimes require to

13   some degree -- and I'm paraphrasing -- that the

14   defendant be aware that he is doing something in

15   violation of regulations.  That makes them unique

16   among crimes.  And for that reason, Mr. Hadjiev's

17   understanding of what people told him, for example, a

18   law enforcement agent representing to him that

19   something is stolen, that he is not a native English

20   speaker is important for the jury to understand.

21                   And then just lastly, Your Honor, I

22   mean, the government's saying that they can introduce

23   a Bulgarian interpreter and they can introduce all

24   this evidence, but I'm somehow precluded from saying,

25   hey, my client is from Bulgaria.  I don't understand

1   that.  I genuinely don't, Your Honor.  I'm not being

2   flip.  I don't understand that position by the

3   government.  And if Your Honor does then I apologize

4   for that part of it.  But I maintain his origin has a

5   lot --

6                THE COURT:  That little phrase you just

7   --

8                MR. CEVALLOS:  -- to do with his

9   understanding.

10                THE COURT:  -- stuck in -- that little

11   phrase you just stuck in will come back to haunt you.

12   If Your Honor does, I don't know what it is.  Mr.

13   Cevallos, you have not got a chance to convince a jury

14   that I am on one side or the other.  Your little

15   phrases were offensive before.  Now that we're closer

16   to trial, because we will have a trial date -- don't

17   say things like that.  Don't say things --

18                MR. CEVALLOS:  Your Honor, I --

19                THE COURT:  -- like that in my

20   courtroom here or there.  I have not pre-judged.

21                MR. CEVALLOS:  Your Honor, I don't know

22   what you're talking about.

23                THE COURT:  Why are we having this?

24   Why are we having this hearing?  Because I didn't

25   prejudge.  And I wanted to hear the sides out before I

1    made a decision.  Some judges would not have given you

2    a hearing.  You take something where you could

3    actually win an argument and turn it around so that

4    you use so many words, sometimes words that don't even

5    apply that it's not going to work for you.  It's time

6    just to be straight on what you're saying.  I think

7    the written was a little clearer than your oral.  But

8    I've heard enough.

9                    Ms. Newton?

10                   MS. NEWTON:  Your Honor, as the Court's

11   aware, the only thing we're asking is that unless Mr.

12   Cevallos is going to produce competent evidence during

13   the trial with respect to Mr. Hadjiev's background, he

14   cannot refer to it in the opening.  The government

15   agrees that whether or not Mr. Hadjiev is Bulgarian

16   does not matter.  It is not relevant.  Certainly, the

17   jury is going to hear that Mr. Hadjiev has an accent.

18   And Mr. Cevallos can make whatever arguments he wants

19   to with respect to the fact that Mr. Hadjiev has an

20   accent.  But the jury will hear the recordings with

21   the undercover officer.  The jury will hear the

22   recording with respect to the Bulgarian language, as

23   the Court is aware, simply because someone speaks in a

24   foreign language does not mean that's where they're

25   from.  Case in point is an Armenian who speaks

1    Russian.  People who choose to speak Spanish, people

2    who choose to speak French.  But it's not relevant to

3    the issues that are -- that we have here before us in

4    this case.

5                    But what the government was primarily

6    trying to do is to ensure that the defense is aware,

7    if they want to put forth statements in the opening

8    with respect to nationality, with respect to his

9    background, that they need to be sure that there's

10   going to be competent relevant evidence presented

11   during the trial of those particular facts.

12                   THE COURT:  Well, I could envision very

13   easily the facts of the case, even the government's

14   case, exposing that he is a speaker of another

15   language first --

16                   MS. NEWTON:  Absolutely, Your Honor.

17                   THE COURT:  -- that being Bulgarian --

18                   MS. NEWTON:  Absolutely.

19                   THE COURT:  -- because they're going to

20   hear his voice.  They're going to hear on the videos

21   or the tapes and they will have questions if it's not

22   addressed right away.  I see it as informational.

23                   MS. NEWTON:  Absolutely.  And all the

24   government is saying is that if that evidence is going

25   to be presented, whether they -- the point the

1    government is trying to make is I wouldn't -- if I

2    were defense counsel, I wouldn't want to assume the

3    government will present this evidence.  But if there

4    is evidence that they want to put forward about Mr.

5    Hadjiev's background that they should be sure that

6    there is going to be that evidence put forth during

7    the trial that is simply not going to be referred to

8    in an opening and left there.  That's the only point

9    of the motion.

10                   THE COURT:  Makes sense to me to be

11   aware of that very big problem.  But is there a chance

12   that the government won't be producing tapes with his

13   accent clearly heard on it?

14                   MS. NEWTON:  Your Honor, absolutely.

15   We'll be presenting the recordings of the undercover

16   officer.  We also will be presenting recordings from

17   the FDC.  And it will be noted that the language in

18   which Mr. Hadjiev is speaking with someone else is

19   Bulgarian.  There's no question about that we will.

20                   THE COURT:  Okay.  That would seem to

21   me to be opening enough to refer to it.  But I also am

22   hearing the government's warning there that they may

23   not be utilizing that in any other way.  But the

24   defense certainly can to a certain --

25                   MS. NEWTON:  Of course.

1                    THE COURT:  -- limited degree.

2                    MS. NEWTON:  Of course, Your Honor.

3                    THE COURT:  All right, Mr. Cevallos.

4      This is a question of opening doors and relying on the

5      record.  I am not a judge that likes to let things

6      happen and then have to strike.  Juries don't like

7      that.  And I like to give as pristine a case to a jury

8      as I can.  So I have no problem with you mentioning

9      that he speaks Bulgarian as his first language.  I

10     have no problem with that.  I don't care if he was

11     born there or not because we earlier ruled this is not

12     about his citizenship status, immigration status or

13     anything else.  So keep that very clear.

14                    What do you clearly, Mr. Cevallos,

15     intend to say in your opening about this so that we

16     are all on the same page?

17                    MR. CEVALLOS:  Your Honor, I intend to

18     refer to his speaking Bulgarian as his first language.

19     And respectfully, Your Honor, I can't say I've

20     crystalized the rest of my opening at this point.  But

21     that he is Bulga -- excuse me -- Bulgarian is his

22     first language and that the jury will hear

23     conversations using slang and that the jury should

24     consider -- no, not in my opening.  Excuse me.  And

25     that they will see -- hear Mr. Hadjiev's responses to

```
 1    that slang.  And since my opening is just a preview of

 2    the facts that I thing will come out, that should be

 3    it, Your Honor.  And if Your Honor is saying that it

 4    should be just that he speaks Bulgarian as a first

 5    language, I can adhere to that.  My main concern is

 6    opening the door to his immigration status coming in

 7    but referring to what I see as an issue that's going

 8    to come in no matter what, that he speaks with an

 9    accent and speaks Bulgarian to his family.

10              THE COURT:  It's one thing to say that

11    Bulgarian is his first language and he doesn't

12    understand what he's hearing or slang.  It's another

13    to say that he doesn't speak English to be clearly

14    understood.  Do you mean to do both?

15              MR. CEVALLOS:  What I'm -- more the

16    first of what Your Honor said, the former, that he

17    speaks Bulgarian as a first language.  And therefore,

18    his understanding, particularly of slang, will be less

19    than that of the ordinary factfinder given that they

20    bring their ordinary sensibilities to this trial, that

21    Mr. Hadjiev has something below the floor or below the

22    standard for what people understand when it comes to

23    slang.  And, Your Honor, there's a lot of slang in the

24    transcripts and in the video.  And the government's

25    going to say, and I understand, they're going to say
```

```
 1    that's slang.  And there's case law.  They have case

 2    law.  They've cited it before in their memo supporting

 3    the idea that you don't need to say flat out the words

 4    "stolen" and I understand that.  But at the same time,

 5    the government must represent.  That's the magic word.

 6    And so, whether or not they represented to somebody

 7    who isn't familiar with slang I think is relevant

 8    to -- is relevant when you're dealing with someone who

 9    does not speak English as a first language but as a

10    second language.

11                   THE COURT:  All right.  I will be as

12    clear as I can and concise as I can.  And I suggest

13    that you be, too, Mr. Cevallos.  I know you haven't

14    prepared your opening yet even though we were supposed

15    to go to court today and try the case.  But I am very,

16    very sure that there's a limited purpose for this that

17    is relevant and that is about his speaking and

18    comprehension.  And I can see why that would be

19    relevant to several matters in this case.  And that's

20    permitted in the opening.  And no references to any

21    other characteristic that I have previously ruled

22    would not come in, meaning his status as an immigrant.

23    All right?

24                   MR. CEVALLOS:  Yes, Your Honor.

25                   THE COURT:  Okay.  Defendant's motion
```

1    in limine to preclude reference to prior arrest,

2    investigation and prosecution.  Document number 203.

3                    Ms. Newton?

4                    MS. NEWTON:  Yes, Your Honor.

5                    THE COURT:  Does the government have

6    any prior convictions to use for impeachment purposes

7    should he testify?

8                    MS. NEWTON:  No, Your Honor.

9                    THE COURT:  So there aren't any --

10                   MS. NEWTON:  No, Your Honor.

11                   THE COURT:  -- that you are aware of.

12                   MS. NEWTON:  That's correct.  That is

13   correct.

14                   THE COURT:  So, Mr. Cevallos, I was

15   sitting here scratching my head when I first read my

16   motion.  I didn't know that this referred to anything.

17                   MR. CEVALLOS:  May I, Your Honor?

18                   THE COURT:  Please.

19                   MR. CEVALLOS:  There are some areas in

20   the transcripts, and they may not be transcripts that

21   the government is introducing.  The government isn't

22   necessarily introducing all of the transcripts or the

23   recordings -- that in which Dimitre -- or Mr. Hadjiev

24   refers back to some earlier trouble that he had.  And

25   as I said, Your Honor, I can't cite the exact date.

1  My apologies, Your Honor.  But I want to be careful

2  that the government doesn't inadvertently, arguably,

3  Your Honor -- I'm not saying that they would do so

4  intentionally.  But as we're going through trial, that

5  might come in.  So that's why I put the motion on the

6  record.  However, the government's response was I

7  thought very reasonable.  They -- the government said

8  they don't intend to introduce his prior troubles in

9  the early -- or in the last decade in the Court of

10  Common Pleas.

11            And then, Your Honor, I candidly --

12  it's a thorny issue.  And I just want to clarify for

13  the government.  When I wrote that the government may

14  not introduce the jail house informant, I didn't mean

15  it's a problem with the English language.  I didn't

16  mean that the government cannot.  I meant that they

17  might not.  And the government responded that they

18  absolutely intend to.  That's fine.  I understand Your

19  Honor already ruled on that.  If there was any

20  confusion with the word "may" then I apologize.

21  However --

22            THE COURT:  I think that's a different

23  motion but we'll get to it.  I'm talking really about

24  the prior investigations and prosecutions.

25            MR. CEVALLOS:  Well, yes, Your Honor.

1    If the government isn't intending to introduce it then

2    I have no dispute as to the prior investigations,

3    arrests and whatnot, Your Honor.

4              THE COURT:  Yes.  There's no reason for

5    that to come in.

6              MS. NEWTON:  Your Honor, just to

7    clarify, though.  And I'm not sure exactly what Mr.

8    Cevallos is referring to.  But if he's referring to a

9    statement where Mr. Hadjiev says I had prior troubles,

10   that is not necessarily referring to a conviction and

11   arrest or a prosecution.  So I'm a little concerned

12   about his reference to say we cannot say -- we cannot

13   introduce something where Mr. Hadjiev himself says I

14   had trouble because, to me, that is not the same as

15   the government introducing evidence of a prior arrest,

16   conviction or prosecution.

17             MR. CEVALLOS:  Your Honor, I can help.

18   I'm not saying that.  The government's right.  That

19   would be too vague.  I'm talking about anything that

20   would identify prior legal criminal problems in

21   specifically the Court of Common Pleas.  And that's

22   it, Your Honor.  I was just speaking in shorthand.

23             THE COURT:  Okay.

24             MR. CEVALLOS:  So my apologies.

25             THE COURT:  So I think it's clear that

1    no Court of Common Pleas prior arrests or

2    investigations will be introduced by the government.

3    And opening doors, of course, during a trial is always

4    a calamity and it could happen.  We'll take things one

5    step at a time if that does.  But if the defense opens

6    doors, and that is possible because there are things

7    that happen in trial that you don't anticipate, we

8    will then assess whether or not the government wishes

9    to pursue anything in terms of rebuttal or

10   cross-examination.  I highly doubt that if it's an

11   arrest that ended up with no charges.  I highly doubt

12   if it's an investigation that did not result in

13   charges.  But we will leave that as clear as it can

14   be.

15              Okay.  The next one is defendant's

16   motion in limine to preclude reference to pretrial

17   incarceration and requests for a limiting instruction.

18   Of course, this has to do with the recordings that

19   have already been ruled authentic.  And I'd like to

20   know what we didn't cover in the ruling, Mr. Cevallos,

21   that brings this motion part way back.

22              MR. CEVALLOS:  Well, Your Honor, first,

23   in the government's response, it seems we have an

24   agreement as to the stipulation, at least with the FDC

25   calls.  So as -- so to that extent, I think the motion

1    is resolved that we would stipulate to the calls

2    themselves.

3              The government also adds that to the

4    extent this motion is asking for suppression of

5    testimony by a cooperating witness who is in the FDC

6    when Mr. Hadjiev was detained, that's not what we're

7    asking at all, Your Honor.  And candidly, I've put my

8    motion -- it's a thorny issue, but that, of course,

9    he's going to be testifying about having been with Mr.

10   Hadjiev in the FDC.  I can't imagine excising that.

11   If the Court could think of a way to do it then great

12   but I don't know that it can.  So instead, I propose a

13   limiting instruction.  I put the nature of the

14   limiting instruction in my motion.  And then that's

15   it, Your Honor.

16             THE COURT:  All right.  Ms. Newton,

17   what do you think of the limiting instruction?

18             MS. NEWTON:  Your Honor, I think the

19   limiting instruction -- it does not tell the truth.

20   Not every defendant automatically is detained at the

21   FDC for a period of time.  And to tell that to the

22   jury, I think is just wrong.  What we have proposed

23   for the Court is we don't need to say that Mr. -- that

24   our cooperating witness knew Mr. Hadjiev from the FDC.

25   What we will ask him is does he know Mr. Hadjiev, how

```
 1    long has he known Mr. Hadjiev, did he have

 2    conversations with Mr. Hadjiev, did he have

 3    conversations with Mr. Hadjiev about this business.

 4                 As the Court aware, there are witnesses

 5    who are detained in the federal detention center who

 6    testified at trial tomorrow every month of the year.

 7    And the government read the motion was that Mr.

 8    Cevallos was asking to preclude this witness from

 9    testifying.  But we believe as we normally do in these

10    circumstances that we do have a way to limit any

11    possible prejudice to Mr. Hadjiev to what we outlined

12    as to what we ask our cooperating witness.

13                 MR. CEVALLOS:  May I briefly please

14    respond, Your Honor?

15                 THE COURT:  So the government can

16    produce the informant's testimony without reference to

17    where they were associating.  That's what you intend

18    to do.

19                 MS. NEWTON:  That's what we intend to

20    do, Your Honor.

21                 THE COURT:  Mr. Cevallos?

22                 MR. CEVALLOS:  Your Honor?  Your Honor,

23    yes.  I actually have to object to that.  And that's

24    why I proposed the limiting instruction.  Key to any

25    jailhouse informant cross-examination in my mind is
```

1    the fact that he's a jailhouse informant.  It would

2    only help the government to propose that they met

3    somewhere neutral, at a Starbucks for example, just to

4    discuss these things when (indiscernible) is going to

5    be our argument as it is in most jailhouse informant

6    cases that this informant contacted the government in

7    order to save his own skin, to get a better deal.

8                   So I understand that I am creating a

9    thorny issue, Your Honor.  And that's why I'm asking

10   you to give a limiting instruction.

11                  THE COURT:  It's a little thorny

12   because of how you filed the motion.  You asked the

13   Court to preclude reference to pretrial incarceration

14   when that's really not what you want.  You want a

15   limiting instruction.  You want a limiting instruction

16   to the jury so that you can pursue your

17   cross-examination of the jailhouse informant and your

18   argument.  I get it.  But you ask for something that

19   you really -- talk about equivocating.

20                  I think that the government can choose

21   not to say the informant was from the FDC.  But I also

22   think that the defense can choose to elicit facts

23   about him being in the FDC.  I don't see those two

24   choices as being the problem.  Even if nothing was

25   said, you could have jurors that could be sitting

1    there (indiscernible), you know, where did they --

2    have that conversation.  And they might be thinking

3    it.  So it's best to have or to be prepared that we're

4    going to need a limiting instruction.  It's best to be

5    forward with it.

6                    MS. NEWTON:  Your Honor, if I could

7    propose the limiting instruction that the jurors are

8    informed that the fact that Mr. Hadjiev may have been

9    detained at the FDC for a period of time should not be

10   considered by them.  And I think that would accomplish

11   what we need to accomplish without telling them

12   something that is not true.

13                   THE COURT:  Your last few words were

14   sort of dropped.

15                   MS. NEWTON:  Sorry, Your Honor.

16                   THE COURT:  Should not be what?

17                   MS. NEWTON:  Should not be considered

18   by -- should not be considered by them.

19                   THE COURT:  And that is a typical

20   instruction that is given for people who are obviously

21   in jail and testified and/or were in jail and

22   testified.

23                   MS. NEWTON:  That is correct, Your

24   Honor.

25                   THE COURT:  Mr. Cevallos, do you have

1    any problem with that?

2                    MR. CEVALLOS:  No objection, Your

3    Honor.

4                    THE COURT:  Okay.  We will use that.

5                    I'll leave it for trial for counsel to

6    ask the Court to give that type of instruction before

7    the informant testifies or later --

8                    MS. NEWTON:  Absolutely, Your Honor.

9                    THE COURT:  -- with the general jury

10   instructions.  You may not choose to make that

11   decision now.  So I leave that for how the trial will

12   go.

13                   All right.  Then the government's

14   motion to exclude testimony of Defendant's expert

15   witness, Joshua Hyman.  I think that is the last

16   motion --

17                   MR. CEVALLOS:  Your Honor --

18                   THE COURT:  -- (indiscernible) parts.

19                   MR. CEVALLOS:  Your Honor, there's also

20   ECF 205 filed on 12/29/2021, the motion as to face

21   masks.  (Indiscernible) --

22                   THE COURT:  Yes.  I put that completely

23   separate.  This is substantive as to the case.  The

24   other is logistics but we're going to get to it.

25                   Now I've read this motion.  I've read

1    the responses.  And I really do think that there is

2    room for a defense expert here.  But the first thing

3    to do is to confirm that the government's motion does

4    not include contesting his qualifications as to

5    certain issues or any issues.  So I need to clarify

6    that with you, Ms. Newton.

7                  MS. NEWTON:  Your Honor, until we

8    received Mr. Cevallos' response, we were contesting

9    his qualifications because we knew nothing about his

10   qualifications other than as a gemologist.  Mr.

11   Cevallos did provide a disclosure with his response

12   and we are not contesting his qualifications at this

13   time now that we have specific qualifications with

14   respect to his work with Rolex watches.

15                  THE COURT:  All right.  So aside from

16   qualifications, then what is the government

17   contesting?

18                  MS. NEWTON:  Your Honor, we do not

19   believe that the defense has provided sufficient

20   disclosures of the opinions and bases for those

21   opinions of Mr. Hyman.  For example, the defense had

22   stated that Mr. Hyman will give opinions about the

23   watches that were examined in 2020.  But nowhere does

24   the defense state what those opinions.  And we believe

25   we're entitled to know what the opinions are.  We know

1    Mr. Hyman was present at the examination but we don't

2    know what his expert opinions with respect to those

3    watches examined at that time are.  And similarly,

4    there's -- and I'll start with that because that is

5    our most basic objection.

6                    But as we also stated, with respect to

7    a number of other topics that the defense has listed

8    for Mr. Hyman, we don't know what the opinions are and

9    we don't know what the bases for those opinions are at

10   this time.  And also, we believe that some of these --

11   and perhaps the defense can explain this.  We're not

12   trying to get into trial strategy but what the

13   relevance of some of these topics are.  Now the

14   government recognizes we are fronting this issue about

15   relevance.  If the defense wishes to wait until trial

16   and put this forward and we will make objections, then

17   as to the relevance of other opinions, once we know

18   the opinions and their bases, certainly, Your Honor,

19   that is one way to go.

20                   THE COURT:  Why do you not know -- I

21   thought that there were rules about this and that

22   disclosures of the testimony of proposed expert

23   witnesses was required for both sides.  Why is this a

24   mystery going into court?  Mr. Cevallos, I'm going to

25   pose that question to you.

```
 1                    MR. CEVALLOS:  Your Honor, to the
 2      extent we hadn't provided the Rule 16(a)(1)(C)
 3      summary, we can.  We should have and we will, Your
 4      Honor.  Now that there is a delay, I put in my
 5      response that this is something that we can provide.
 6                    THE COURT:  Had there not been a delay
 7      in the trial again, would we be facing this in the
 8      middle of the trial because that's not appropriate
 9      either.  You were required to do that.  And I'm not
10      the judge that would say, well, too bad.  Your
11      expert's stricken.  But I know that there are judges
12      that would and probably would not be reversed on
13      appeal.  But I think until you do that, we don't have
14      a basis to allow any testimony without their being
15      some rule disclosure, doesn't involve strategy but it
16      does involve the expertise, the expertise, the opinion
17      that you will want to introduce at trial.  Only then
18      can the government properly articulate its objection
19      if they have any.  But ultimate issues, we know how to
20      rule on that.  But expertise of whether or not a part
21      is indicative of a stolen watch or a stolen part, I
22      think the jury would welcome that kind of evidence.
23      It's not a question of anything except we don't what
24      really is going to be said.  And I can't allow that.
25                    So get that report done, Mr. Cevallos.
```

1    And I'm not going to rule on this until it's done.

2    And then I'll allow you to rebrief it if there's

3    continued -- if there's not an agreement as to what is

4    objected to here.  But it's not the qualifications.

5    That is for sure.  But we still need to know -- it's

6    on relevant testimony.  And we need to know it before

7    the jury hears it.  All right?  That one I want to

8    hold off on.

9                    MS. NEWTON:  Your Honor, one other

10   issue with respect to the expert disclosure and we

11   have raised it in our motion.  In the initial

12   disclosure made by the defense, they also disclosed an

13   expert, Mr. Josiah Lamb as a forensic accountant.  Mr.

14   Josiah Lamb was not listed in the disclosures that the

15   defense recently made.  And we are just trying to

16   determine are they still planning on calling Mr.

17   Josiah Lamb and, if so, we have the same concerns

18   about what are the opinions and the bases for the

19   opinions.

20                   THE COURT:  Mr. Cevallos?

21                   MR. CEVALLOS:  We're not planning on

22   calling Mr. Lamb.  We omitted him from our most recent

23   disclosure.  The first time around, we just disclosed

24   him out of an abundance of caution.  And now we -- I

25   should have been clearer to the government and maybe

 1    sent an e-mail and said we're not calling Josiah Lamb

 2    but I just omitted him from the most recent

 3    disclosure.

 4              THE COURT:  All right.  So he is not

 5    testifying at this time.

 6              MR. CEVALLOS:  That's correct, Your

 7    Honor.

 8              THE COURT:  Okay.  If you change your

 9    mind, you've got to tell Ms. Newton and make a full

10    disclosure on it.  And that includes what he would be

11    called to testify about.

12              Now I think that does it for the

13    substantive motions in limine for now.  I would like

14    to address the conditions of trial which always,

15    always, always have to be related to the time the

16    trial is heard.  And I read with great concern the

17    motions because I don't know if I can get the complete

18    cooperation from the administration of the court to

19    put screens up everywhere but we have requested it.

20    If we had gone to trial today, we would do that with

21    an insistence that we're in the middle of another

22    crisis in this pandemic right now.  We may not be in

23    three weeks or four weeks.  This is a different moving

24    type of germ.  And it's much faster, much more

25    contagious.  More people get it.  Not as many people

1    are getting seriously sick.  It doesn't mean that I

2    want anyone exposed to it.

3                    The court, as a Board of Judges, has

4    also -- is also considering whether or not only

5    vaccinated people should be jurors, which we have not

6    approved, and only vaccinated people can come into the

7    courthouse which we have not approved.  It seems to me

8    we have to keep the doors of justice open and we have

9    to cope with the residuals.  And that means that

10   masking, double-masking, even with face shields may be

11   appropriate.

12                   Which gets to the defense question of

13   wants multiple parties' face masks removed during the

14   trial which I cannot approve at this time given the

15   situation in being fluid.  I think it's premature now

16   to do that.  So that's how I'm going to leave that

17   ruling.  I was considering moving the tables back to

18   the way they were when you had a hearing in my

19   courtroom 12A where the counsel tables were facing the

20   jury box and the jury would be seated in the gallery.

21   I still think that's safer because the jury should not

22   be sitting next to each other in those seats and there

23   wouldn't be enough seats for all the jurors if we

24   spread them out.  So we will use again jurors fully

25   masked.  If they want to wear face shields on it,

1    that's fine.  I know that we can get face shields.

2    But I don't think too many people want to rely on just

3    face shields for protection against fast flying germs.

4    So the jurors will be in the gallery.  I have not yet

5    secured a second room, courtroom, to house spectators.

6    So that is also a problem for me.  Our trials are

7    public; they're open.  We want them to be.

8              Anyway, that's how far I got on

9    logistical decisions which, again, have to be fluid.

10   I know that there's another concern that the defendant

11   himself is not vaccinated.  And we can't ban

12   defendants from the courtroom in which they are on

13   trial.  So the mask will have to be on the entire

14   time.  And it has to be a KN-95 or a K-95.  No other

15   kinds of mask are really fool proof.  And those even

16   aren't fool proof.  People with full vaccinations and

17   boosters are still getting COVID.  So we have to be

18   more careful than that.

19              I want to know, Mr. Cevallos, of all

20   the things that you ask for in your motion -- which I

21   welcome because we have to deal with this anyway.  We

22   would be talking about these same things even if you

23   hadn't filed the motion.  We've talked about them

24   before.  I proceed with caution.  So how do you intend

25   to sit next to your client without him being

1   vaccinated?  Just a question.  How would you like to

2   be seated?

3                   MR. CEVALLOS:  Well, Your Honor, I

4   hadn't thought of that question for oral argument

5   purposes but I think probably the way we've been

6   seated already, I think -- six feet away from each

7   other when we've been before Your Honor.  And Your

8   Honor just said that there are limitations.  I

9   understand the Court can't just throw up a bunch of

10  Lexan glass all over the courtroom.  So, I mean, what

11  I would like to have happen versus what is realistic,

12  I mean, I can talk about my -- what would be great to

13  have but, Your Honor, I mean, I guess we would start

14  with distance.  And really, candidly, Your Honor, at

15  the end of the day, my own comfort in being close to

16  the defendant wasn't really the purpose of the motion.

17  It's, as Your Honor said, putting these issues --

18                   THE COURT:  Well, I ask you --

19                   MR. CEVALLOS:  -- before the Court --

20                   THE COURT:  -- the question not because

21  you included it in your motion but because it's only

22  fair to ask you that question.  It's only fair to say

23  how can you ask everyone else to take their masks off

24  which you did.  What are you going to be doing sitting

25  next to an unvaccinated person?  Six feet?  Is that

```
 1    enough?  Because that's fine with me.  But he can't be
 2    near anybody else that doesn't agree to be in his
 3    presence, in his sphere of air.  I mean, I think that
 4    there's protocols here that are not strategic in terms
 5    of winning a case.  They are logistical for safety so
 6    that we can have a trial that doesn't get interrupted
 7    by two jurors or an agent or a witness getting sick in
 8    the middle of it.  And we have to struggle with
 9    regulations.  There is no way to say you can't come in
10    this courtroom unless you're vaccinated.  Or you can't
11    sit on this jury unless you're vaccinated.  We know
12    that that is not our role.  Our role is to make it as
13    safe as we can taking all of those particular
14    preferences into account.  This is an important for
15    everybody.  So I was curious about that.  I do think
16    we have another face on the screen.
17               MR. SCUDERI:  Your Honor, that's me.
18               THE COURT:  Mr. Scuderi, I want to
19    announce you because we are recording this.
20               MR. SCUDERI:  Yes.  And, Your Honor,
21    I'd like the opportunity to speak to the defendant to
22    try to get him vaccinated.  What you're saying is
23    tremendously appropriate since he's not vaccinated and
24    I think it's wrong.
25               My other --
```

1                    THE COURT:  We're losing your voice,

2    Mr. Scuderi.

3                    MR. SCUDERI:  Your Honor, I would like

4    --

5                    THE COURT:  Can you turn up your

6    volume, please?

7                    MR. SCUDERI:  Can I turn up my volume?

8                    THE COURT:  Or maybe the microphone

9    part is muffled?

10                    MR. SCUDERI:  I don't --

11                    THE COURT:  Is ours up?

12                    MR. SCUDERI:  Where is it?  How about

13    now?  Is that better?

14                    THE COURT:  I think it is.

15                    MR. SCUDERI:  Okay.  Sorry, Your Honor.

16                    THE COURT:  It's okay.

17                    MR. SCUDERI:  Screen and not the

18    microphone.

19                    Your Honor, I would like the

20    opportunity to speak to the defendant again about him

21    being vaccinated because I would not feel safe being

22    near him.  And I intend to be sitting next to him with

23    Mr. Cevallos on the other side.

24                    Also, my other question is whether we

25    are able to ask the jurors, the prospective jurors

1    whether they are vaccinated because I think that would

2    be a safety issue for jurors who are sitting with

3    people who are unvaccinated.  Now I know it's up to

4    the Court and whatever you say we will do, but,

5    obviously -- but I think that's a major safety issue

6    if -- I don't whether it's six feet or ten feet.  If

7    the jurors are with somebody who is unvaccinated then

8    statistically, the six feet or ten feet is not a

9    definitive term.  That's what --

10             THE COURT:  Okay.  You know, I don'[t

11   think asking jurors is the problem because they're

12   going to be on a questionnaire.  We just can't strike

13   them for that reason unless there is a decision, a

14   stipulation that the defendant is and the government

15   are willing to enter into that says we will not have

16   anyone but fully vaxed or boosted or both jurors.

17             MR. SCUDERI:  Well, I would --

18             THE COURT:  That is completely out of

19   my authority to order unless it's by stipulation and

20   waiver because it's a jury of one's peers.  It

21   involves all -- so many issues, constitutional issues,

22   that we don't wish to open that door and run afoul.

23   You can talk about that as you will.  But that is an

24   option.  I didn't ask the government what they thought

25   of that option.

1                    MR. SCUDERI:  I would think that K.T.

2      would agree.

3                    THE COURT:  Well, she can answer for

4      herself.

5                    MS. NEWTON:  Thank you, Your Honor.

6      Your Honor, I've actually discussed this in my office.

7      And if need be, we certainly will put together a

8      motion for it.  But the government would be willing to

9      stipulate to having only vaccinated jurors on this

10     jury for the simple reason of safety of everyone in

11     the courtroom.

12                    MR. SCUDERI:  I agree, Your Honor.  I

13     always agree with K.T.

14                    MS. NEWTON:  I wish I could say that

15     was true, Your Honor.

16                    THE COURT:  But Mr. Cevallos is not.

17     So I'm going to ask him what his position is.  Mr.

18     Cevallos?

19                    MR. CEVALLOS:  I agree, Your Honor.

20                    THE COURT:  Okay.  So you have to get

21     your client to agree.  And we would love that waiver

22     in writing, that agreement.  And we will colloquy him

23     appropriately when that is necessary.  And it will be

24     necessary should we start trial in the next three

25     months or longer.  So I think that's the only way we

1    can do it.  But it is a way to safeguard jurors'

2    concerns.  And I will be quite blunt.  When the jury

3    trials have started to resume and they resumed last

4    week, things were done pretty well except that jurors

5    started calling up and saying we're not coming in.

6    We're just not coming in.

7                   MR. SCUDERI:  Right.

8                   THE COURT:  And you don't hold jurors

9    in contempt when health and safety is such a difficult

10   issue right now.  And that doesn't define it.

11                  MR. SCUDERI:  Your Honor, I could not

12   agree more.  And I had COVID.  It is not a fun time.

13   So all the defense team is fully vaccinated.  I will

14   state to the defendant.  I will force him to get

15   vaccinated.  And I don't think any of us wants anybody

16   to get sick during the trial.

17                  THE COURT:  Well, as I recall, the

18   defendant got COVID at the FDC.

19                  MR. SCUDERI:  Yes.  Yes.  Yes.

20                  THE COURT:  But that doesn't guarantee

21   future immunity.

22                  MR. SCUDERI:  Correct.

23                  THE COURT:  And neither does the

24   vaccine guarantee that.

25                  MR. SCUDERI:  Correct.

1                        THE COURT:  So we're all on the edge of

2      the cliff here.

3                        MR. SCUDERI:  Right.  But it is

4      helpful.  It is one step -- it is one further

5      precaution.  And I agree with K.T.

6                        THE COURT:  Okay.  Any other parts of

7      that motion, Mr. Cevallos, that you'd like to bring

8      back to discussion?

9                        MR. CEVALLOS:  No, Your Honor.

10                        THE COURT:  Okay.  We will do our best

11      to get those screened in.  But they probably won't

12      give them to me because I don't have a trial next

13      week.  That one continued for other reasons.  And I

14      will try and keep our courtroom ready.  But I am

15      scheduled with various trials up until May.  Some of

16      those may go away through a guilty plea.  Therefore, I

17      may try to put this back on.  But, of course, I know

18      you all have concerns, witnesses, other obligations,

19      but this case has got to get tried.  It must be tried.

20      I agreed, however, with the government's assertion in

21      the motion to continue, which was also not opposed,

22      that this is not the case that is the exigent or

23      emergent case.  (indiscernible) will have to go first

24      and other concerns.  So I'm trying to be reasonable

25      and bend.  But I don't want to bend too often.  I

1   could have kept this on the trial wheel.  I could have

2   had a jury.  We would be facing all of these problems.

3   And I think everybody has to go home to loved ones and

4   co-workers and it's not fair to risk one's life.  So I

5   agree the definitions of this case not having to be

6   ahead of other cases.  But I have always made it a

7   priority.

8               All right.  Is there anything else we

9   can talk about, counsel?

10              MR. SCUDERI:  No, Your Honor.

11              MR. CEVALLOS:  No, Your Honor.

12              THE COURT:  All right.

13              MS. NEWTON:  Nothing from the

14   government, Your Honor.

15              THE COURT:  Okay.  Did Mr. Hadjiev want

16   to talk to his attorneys before we stopped?  Because

17   we can do that if you need?

18              THE DEFENDANT:  No, Your Honor.

19              THE COURT:  Okay.  Thank you.  Thank

20   you, Mr. Hadjiev.  Then we will adjourn this matter.

21   And we will put our agreements and understandings and

22   rulings in a written order so that we all remember

23   what we said.  And we will hopefully see you soon.

24   Please stay safe everyone.

25              MS. NEWTON:  Thank you, Your Honor.

1    You as well.

2                    MR. SCUDERI:  Thank you.

3                    THE COURT:  We're adjourned.

4                     (Proceeding is adjourned)

5                        *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T I O N

2

3              I, Lisa Beck, certify that the foregoing is

4     a correct transcript from the official electronic

5     sound recording of the proceedings in the above-

6     entitled matter.

7

8     _____

9     Lisa Beck

10

11

12

13    Dated:   January 24, 2022

14

15

16

17

18

19

20

21

22

23

24

25
```