**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | |
| DIMITRE HADJIEV | : | CRIMINAL NO. 19-548 |

## GOVERNMENT'S REVISED TRIAL MEMORANDUM

## I.    INTRODUCTION

Since at least 2013, defendant Dimitre Hadjiev has operated a jewelry store, incorporated as Ice Fire Inc., at 330 South Street in Philadelphia, where he sells watches and other jewelry and customizes watches and other jewelry. The FBI and IRS began an investigation of Hadjiev in early 2017 based on reports from cooperating witnesses that Hadjiev was purchasing stolen high-end watches, including Rolex watches.  These charges in this case stem from that investigation, as well as from a review of Hadjiev's bank records and the seizure of counterfeit Rolex watches and watches with counterfeit Rolex parts during the execution of a search warrant at Hadjiev's store at 330 South Street on August 22, 2019.

On March 4, 2021, the grand jury returned a 24-count second superseding indictment charging Dimitre Hadjiev with: in Count 1, money laundering - sting, in violation of 18 U.S.C. § 1956(a)(3); Count 2, failure to file record of financial transaction, in violation of 31 U.S.C. § 5324(b)(1); Count 3 and Count 24, structuring of financial transactions and aggravated structuring, in violation of 31 U.S.C. § 5324(a)(3) and (d)(2); Count 4, trafficking of counterfeit goods (Rolex watches and Rolex watch parts), in violation of 18 U.S.C. § 2320; and Counts 5

through 23, structuring of a financial transaction for the purpose of evading reporting requirements and aggravated structuring, in violation of 31 U.S.C. § 5324(a)(1) and (d)(2).

On November 11, 2022, the government moved for dismissal of Counts 9, 16, 18, 20, 22 and 23 from, and to correct typographical errors (duplicate numbering of Counts 10 and 11) to, the Second Superseding Indictment.

Counts One through Three arise from the defendant's April 26 and 27, 2018 purchase of a Rolex watch, serial #3192K5T0, represented to be stolen, from an undercover officer ("the UCE"), and the May 7 and 8, 2018 subsequent sale of that purportedly stolen Rolex watch, with the serial number almost completely erased,  for $29,000 in cash, to a confidential source ("the CS"), with Hadjiev representing to the CS that the watch had been purchased from a jewelry store on South Street in Philadelphia, and Hadjiev's structuring the deposit of proceeds from that sale into his bank account with cash deposits on subsequent days of less than $10,000 for each deposit. Count Four arises from Hadjiev's possession with intent to dispose of to another, for purposes of commercial gain or private financial advantage, counterfeit Rolex watches and watches with counterfeit Rolex parts.  Corrected ounts 5 through 20 arises from Hadjiev's structuring of more than $270,000 in cash deposits of less than $10,000 each into his bank accounts between March 2016 and July 2018 for the purpose of evading the bank's reporting requirements.  Count 24 arises from Hadjiev's structuring of approximately $670,000 in cash deposits into his bank account between March 2016 and November 2018, with each deposit being $10,000 or less.  The second superseding  indictment also provides notices of forfeiture of criminal proceeds and facilitating property.

## II.   STATUTES CHARGED AND ELEMENTS OF THE OFFENSES

### A.   Count 1 (18 U.S.C. § 1956(a)(3) - money laundering - sting)

To prove a violation of 18 U.S.C. § 1956(a)(3), the government must prove the following

elements beyond a reasonable doubt:

1.   The defendant, with the intent:
    a.   to conceal or disguise, the nature, location, source, ownership, or control, of property believed to be the proceeds of a specified unlawful activity; or
    b.   To avoid a transaction reporting requirement under state or federal law;

2.   Conducts or attempts to conduct a financial transaction;

3.   Involving property represented to be the proceeds of specified unlawful activity.

### B.   Count 2 (31 U.S.C. § 5324(b)(1) - failure to file record of financial transaction)

To prove a violation of 31 U.S.C. § 5324(b)(1), the government must prove the following

elements beyond a reasonable doubt:

1.   The defendant knew of the requirement for a nonfinancial business to file an IRS Form 8300/FinCEN Form 8300 with the Financial Crimes Enforcement Network ("FinCEN") for receipt of more than $10,000 in cash in one transaction or two or more related transactions; and

2.   The defendant knowingly caused or attempted to cause a nonfinancial business or trade not to file an IRS Form 8300/FinCEN Form 8300 for a cash transaction of more than $10,000

### C.   Counts 3, 20 (31 U.S.C. § 5323(a)(3), (d)(2) - structuring of financial transactions, aggravated structuring)

To prove a violation of 31 U.S.C. § 5323(a)(3), the government must prove the following

elements beyond a reasonable doubt:

1.   The defendant engaged in one or more transactions at a financial institution;

2.   The defendant had knowledge of a financial institution's reporting requirements;

3.   The defendant made one or more deposits of cash under $10,000;

4.      The structuring of the transactions was for the purpose of evading those requirements.

To prove aggravated structuring (**31 U.S.C. § 5323(d)(2)**), the government must prove, beyond a reasonable doubt, that there was a pattern of structured transactions, amounting to more than $100,000 of structured transactions within a 12 month period.

**D.      Count 4 (18 U.S.C. § 2320(a)(1) – trafficking in counterfeit goods)**

To prove a violation of 18 U.S.C. § 2320(a)(1), the government must prove the following elements beyond a reasonable doubt:

1. The defendant trafficked or attempted to traffic in goods or services;

2. Such trafficking, or attempt to traffic, was intentional;

3. The defendant used a "counterfeit mark" on or in connection with such goods or services;

4. The defendant knew that the mark so used was counterfeit.

**E.      Counts 5 through 19 (31 U.S.C. § 5323(a)(1), (d)(2)  - causing or attempting to cause a financial institution to fail to file a required report, aggravated structuring)**

To prove a violation of 31 U.S.C. § 5323(a)(1), the government must prove the following elements beyond a reasonable doubt:

1. The defendant, alone or with other people, engaged in one or more transactions at a financial institution;

2. The defendant had knowledge of a financial institution's reporting requirement to report currency transactions in excess of $10,000;

3. The defendant made more than one deposit of cash in a single day, with each deposit not more than $10,000, but the total of the deposits being more than $10,000; and

4. The defendant acted with the intent to evade the reporting requirement.

4

**F.**   <u>Definitions</u>

    **1.**   <u>**"Conducts"**</u>

"The term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction."  18 U.S.C. § 1956(c)(2).

    **2.**   <u>**"Financial Transaction"**</u>

"The term 'financial transaction' means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."  18 U.S.C. § 1956(c)(4).

    **3.**   <u>**"Monetary Instrument"**</u>

"The term 'monetary instrument' means (i) coin or currency of the United States . . . travelers' checks, personal checks, bank checks, and money orders."  18 U.S.C. § 1956(c)(5)

    **4.**   <u>**"Financial Institution"**</u>

"The term 'financial institution' includes -- (A) any financial institution, as defined in section 5312(a)(2) of Title 31, United States Code, or the regulations promulgated thereunder." 18 U.S.C. § 1956(c)(6).  "'[F]inancial institution' means (A) an insured bank . . . (C) a private banker; . . . (J) a currency exchange; (K) an issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments."  31 U.S.C. § 5312(a)(2).

    **5.**   <u>**"Specified Unlawful Activity"**</u>

"The term 'specified unlawful activity' means -- (A) any act or activity constituting an offense listed in section 1961(1) of this title."  18 U.S.C. § 1956(c)(7).  Activities listed in Section 1961(1)(B) include "any act which is indictable under . . . title 18, United States Code . . . sections 2314 and 2315  (relating to interstate transportation of stolen property").

    **6.**   <u>**"Traffics"**</u>

The term "traffics" means "to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or make, import, export, obtain control of, or possess, with intent so to transport, transfer or dispose of."  18 U.S.C. § 2320(F)(5).

### 7.  "Structuring"

A person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements, including the requirement that a financial institution file a report of a deposit or withdrawal of currency of more than $10,000. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.  31 C.F.R. § 1010(xx)

### G.    Law Relating to Money Laundering Charge

#### 1.  Interstate commerce nexus for money laundering charge

The interstate commerce nexus required for a financial transaction in a violation of 18 U.S.C. § 1956(a)(3) is a jurisdictional requirement and an element of the offense. The quantum of proof required to establish this interstate commerce nexus is minimal.  "Proof that a transaction employs a utility of interstate commerce is sufficient." *United States v. Benjamin*, 252 F.3d 1, 9 (1st Cir. 2001) (banks' FDIC certificate sufficient to establish that transactions involving bank had at least a de minimis effect on interstate commerce); *United States v. Peay*,

972 F.2d 71, 74-75 (4th Cir. 1992) (same); *see also United States v. Laurenzana,* 113 F.3d 689, 692 & n. 1 (7th Cir.1997) (reiterating "that the connection to interstate commerce required for a money-laundering offense need only be 'incidental' to the transaction").

In *United States v. Oliveros*, 275 F.3d 1299 (11th Cir. 2001), the defendant was convicted of violating the very statute defendant is charged with violating here -- 18 U.S.C. § 1956(a)(3) -- the "sting" provision of the money laundering statute.  *Oliveros,* 275 F.3d at 1301.  In that case, it was an FBI sting in which the FBI agents withdrew money from an FBI bank account, represented to the defendant that the money was drug money, and then the defendant provided an FBI informant with checks in exchange for the "drug money" (minus a ten percent commission). *Id.* at 1303-04.  The Eleventh Circuit held that the interstate commerce nexus for the financial transactions was established because the FBI's bank was engaged in business in interstate commerce, as the statute requires "only that the transaction involve the use of the institution in some way."  *Id.*  Specifically, the court held: "Even though the withdrawal from the bank occurred before the transaction that formed the basis of Oliveros' conviction . . ., the financial institution was involved at least incidentally in Oliveros' receiving the cash, and that degree of involvement is a sufficient predicate for federal jurisdiction." *Id.* at 1304.

For these reasons, the government will request a jury instruction that makes clear that the interstate commerce element is satisfied if the funds provided to Hadjiev by the CS for the purchase of the Rolex watch on May 8, 2018 were obtained from an FDIC insured bank.

## 2.  <u>Representations by the Undercover Officer</u>

Representations made by an undercover officer in a money laundering sting operation as to the fact that the source of the property is a specified unlawful activity need not be express representations.

Instead, those representations may be implied.  *See, e.g., United States v. Nelson*, 66 F.3d 1036, 1041 (9th Cir. 1995); *United States v. Starke,* 62 F.3d 1374, 1382 (11th Cir. 1995) (to satisfy representation element of 18 U.S.C. § 1956(a)(3), government need only prove that law enforcement officer or other authorized person made defendant aware of circumstances from which reasonable person would infer that property was drug proceeds); *United States v. Jensen,* 69 F.3d 906, 911 (8th Cir. 1995) (representation by undercover officer that money is drug money may be implied by officer); *United States v. Arditti*, 955 F.2d 331, 339 (5th Cir. 1992) (undercover agent not required to expressly "recite the alleged illegal source of [the] . . . property at the time he attempts to transfer it in a 'sting' operation"); *see also United States v. Wydermyer,* 51 F.3d 319, 327–28 (2d Cir.1995) ("fact-specific" inquiry whether agent's statements sufficiently convey that money to be laundered derived from a specified offense). The government will propose a jury instruction which makes clear that the representations of the undercover officer ("UCE") as to the source of the watches sold to defendant Hadjiev can be implied.

### 3.  <u>Specified Unlawful Activity</u>

It is appropriate to instruct the jury that, as a matter of law, the transportation across state lines of stolen goods with a value of $5,000 or more, or the sale of such items, is a "specified unlawful activity." Because such transportation or sale is not one of the charged offenses, the Court should not instruct the jury on the elements of those crimes.  *See, e.g., United States v. Golb,* 69 F.3d 1417, 1429 (9th Cir. 1995).  *See also United States v. Martinelli,* 454 F.3d 1300, 1311-13 (11th Cir. 2006) (noting that Court was "unable to find *any* money laundering conspiracy case that required jury instructions on the elements of the specified unlawful activity").

### 4. **Expert Witness Testimony**

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. An expert's opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703. An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704. This Court "has broad discretion to admit or exclude expert testimony, based on whether it is helpful to the trier of fact." *United States v.Gibbs,* 190 F.3d 188, 211 (3d Cir. 1999).

Testimony from an expert witness is appropriate in a trial involving money laundering, such as this. *See United States v. Wilson*, 355 F.3d 358, 362 (5th Cir. 2003) (permitting IRS agent to testify as expert and explain purpose of Currency Transaction Report ("CTR") and offer opinion that defendant was required to file CTR in that case); *United States v. Puche*, 350 F.3d 1137, 1151 (11th Cir. 2003) (permitting witness to testify that defendant's structuring of deposits to avoid currency transaction reports is indicator of money laundering); *United States v. Fuller*, 974 F.2d 1474, 1482-83 (5th Cir.1992) (permitting expert testimony explaining CTR requirements and reasons people seek to avoid filing CTRs).

In *United States v. Campbell,* 347 Fed. Appx. 923, 928 (4th Cir. 2009), the Fourth Circuit held that expert testimony by an agent about "was likely very helpful to the jury," where the agent gave expert testimony explaining the Bank Secrecy Act ("BSA") and its requirement that a financial institution must submit a CTR whenever an individual made a transaction with more than $10,000 in cash. *Id.* The agent also testified that the BSA made it a crime to attempt to structure a transaction in order to evade the filing of a CTR, gave hypothetical examples of

illegal structuring, so that the jury could better understand types of actions that would be consistent with structuring, and testified as to different ways in which deposits made by defendant were consistent with illegal structuring. *Id.* The Court agreed with the government – that, without the agent's testimony, "the jury would be left to pore over the deposit tickets or spreadsheet entries without guidance as to what to look for," and recognized that "[a]voidance of such a confusion is the purpose of expert testimony: to 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702). *See also United States v. Caro,* 2012 WL 48038, at *24 (11th Cir. Jan.10, 2012) (holding it was proper to admit expert testimony regarding the "content and purposes of BSA, and the CTR obligations of domestic financial institutions"); *United States v. Ortiz,* 1997 WL 225108 *5 (2d Cir. May 5, 1997) (holding that district court properly admitted testimony of IRS special agent who "testified on a broad range of subjects relevant to the money laundering and structuring charges,"  describing "the complex statutory and regulatory requirements imposed by the currency transaction reporting laws; the meaning of financial structuring, as well as the methods by which it is accomplished; and the common methods of money laundering").

### 5. <u>Willful Blindness</u>

The government may request an instruction on willful blindness.  Courts have held that a willful blindness instruction can be given in money laundering sting cases when a defendant asserts a lack of guilty knowledge, but the evidence supports the inference of deliberate ignorance. *See, e.g., United States v. Puche,* 350 F,3d 1137, 1149 (11th Cir. 2003); *United States v. Rivera-Rodriguez,* 318 F.3d 268, 271 (1st Cir. 2003) (holding that knowledge in a money laundering case "can be established by showing that a defendant was 'willfully blind' to facts patently before him"); *see also United States v. Jensen,* 69 F.3d 906, 912 (8th Cir. 1995) (holding that willful blindness instruction was appropriate in money laundering case).

III.    **EVIDENCE**

The government will introduce the following evidence.

1.      Testimony about the March 24, 2017 purchase of five Rolex watches by FBI

An FBI agent will testify that, on March 24, 2017, the FBI purchased from Signet Jewelers/Sterling Jewelers Inc. five Rolex watches, with a total retail value of $80,000, for $59,659.50.  The purchased watches included: (1) a man's stainless steel Rolex Oyster Perpetual Date wristwatch with black dial, Model 16610, Serial No. N398215 (SKU 311553806); (2) a man's 18K yellow gold Rolex Oyster Perpetual Day-Date President wristwatch with champagne dial, Model 18038, Serial No.9587413 (SKU 311346807); (3) man's stainless steel and 18K yellow gold Rolex Oyster Perpetual Submariner wristwatch with slate diamond and sapphire dial, Model 16613, Serial No. A469897 (SKU 311381103); (4) man's stainless steel and 18K yellow gold Rolex GMT II Master Oyster Perpetual Date with black dial, Model 16713, Serial No. S353721 (SKU 311125304); and man's stainless steel and 18K yellow gold Rolex Oyster Perpetual Submariner with blue dial, Model 16613, Serial No. U73355 (SKU 311380101). The receipt for this purchase and certification documents for these watches will be introduced as evidence.

2.      Recording and testimony about the April 17, 2017 sale of purportedly stolen watches to defendant Dimitre Hadjiev by Cooperating Witness #1

FBI agents and the CW will testify that, on April 17, 2017, at the direction of the FBI, Cooperating Witness #1 ("the CW"), who had done business with Hadjiev in the past, went to defendant Dimitre Hadjiev's store at 330 South Street in Philadelphia, PA and sold to Hadjiev, for $5,000 in cash, two Rolex watches that he represented as stolen, but that had in fact been

purchased by the FBI: (1) a Rolex Oyster Submariner, 14k yellow gold, men's wristwatch, Model 16613, Serial No. U730355, with a retail value of $12,800; and (2) a Rolex GMT Master II Oyster, 18k yellow gold, men's wristwatch, Model 16713 serial #S353721, with a retail value of $12,400.  The recording of this meeting, as well as photos of the watches sold to Hadjiev and the scan of the cash received from Hadjiev, will be offered as evidence.

      3.      Recording and testimony about the October 20, 2017 sale of purportedly stolen watches to defendant Dimitre Hadjiev by the CW

FBI agents and the CW will testify that, on October 20, 2017, at the direction of the FBI, the CW went to defendant Hadjiev's store at 330 South Street in Philadelphia, PA and sold to Hadjiev, for $8,000 in cash, Rolex watches that he represented as stolen, but that had in fact been purchased by the FBI: (1) a  Rolex Oyster Submariner, stainless steel, perpetual date, men's wristwatch, Model 16610, Serial No. N398215, with a retail value of $8,200; and (2) Rolex Oyster Presidential, 18k yellow gold, perpetual date, men's wristwatch, Model 18038, Serial No. 9587413, with a retail value of $29,800.  The recording of this meeting, as well as photos of the watches sold to Hadjiev and the scan of the cash received from Hadjiev, will be offered as evidence.

      4.      Recording and testimony about the February 6, 2018 introduction of the UCE to defendant Dimitre Hadjiev by the CW

FBI agents, the CW and the UCE will testify that, on February 6, 2018, at the direction of the FBI, the CW introduced the UCE as someone who could bring stolen watches for sale to defendant Dimitre Hadjiev at Hadjiev's store at 330 South Street in Philadelphia.  The recording of this meeting will be offered as evidence.

5.      Testimony about the March 28, 2017 purchase of four Rolex watches by
the FBI

An FBI agent will testify that, on March 28, 2017, the FBI purchased, from Rolex USA

in New York, NY, four Rolex watches, with a total retail value of $138,100, for $84,630.50.  The

purchased watches were: (1) men's Rolex Oyster Perpetual Day-Date, with champagne dial, 36

mm Chronometer, Model M118238-0108, Serial No. 85P33819, retail value of $31,350;

(2) men's Rolex Oyster Perpetual Day-Date, with black dial, 36 mm Chronometer, Model

M118239-0089, Serial No. J5280381, retail value of $37,050; (3) men's Rolex Oyster Perpetual

Day-Date with champagne dial, 40 mm Chronometer Chronergy, Model M228238-0006, Serial

No. 3192K5T0, retail value of $34,850; and (4) men's Rolex Oyster Perpetual Day-Date with

silver dial, 40 mm Chronometer Chronergy, Model M228238-0008, Serial No. 0L289269, retail

value of $34,850.  The receipt for this purchase and photographs of these watches will be

introduced as evidence.

6.      Recording and testimony about the April 25, 2018 sale of purportedly
stolen watches to defendant Dimitre Hadjiev by the UCE

FBI agents and the UCE will testify to the following: On April 25, 2018, at the direction

of the FBI, the UCE went to defendant Dimitre Hadjiev's store at 330 South Street in

Philadelphia, PA and met with Hadjiev to offer Hadjiev two purportedly stolen watches for sale,

both watches that had been purchased by the FBI from Rolex USA: (1) men's Rolex Oyster

Perpetual Day-Date, with champagne dial, 36 mm Chronometer, Model M118238-0108, Serial

No. 85P33819; and ](2) men's Rolex Oyster Perpetual Day-Date, with black dial, 36 mm

Chronometer, Model M118239-0089, Serial No. J5280381.  Hadjiev agreed to purchase the

men's Rolex Oyster Perpetual Day-Date, Serial No. 85P33819, for $7,500.  Hadjiev agreed to

pay the UCE $3,000 that day, and asked if the UCE could come back the next day because

Hadjiev needed time to get the rest of the money for the watch.   The UCE told Hadjiev that he had another watch for sale as well, and Hadjiev told the UCE to bring both watches the next day. During this meeting, the UCE told Hadjiev that he usually came up to Philadelphia once a month for a few days.  The recording of this meeting, as well as photos of the two watches presented to Hadjiev, one of which Hadjiev bought that day, will be offered as evidence.

8.   AT&T subscriber records

An FBI agent will testify that AT&T records show that: (a) defendant Dimitre Hadjiev was the subscriber for 267.258.1360 from January 1, 2009 through March 21, 2021; and (b) J.G. was the subscriber for 225.333.0289 from October 13, 2008 through July 17, 2020.  The AT&T subscriber records for these numbers will be offered as evidence.

8.   Testimony about April 25, 2018 What's App phone call between the UCE and Hadjiev.

The UCE will testify to the following: After he left Hadjiev's store on April 25, 2018, he and another FBI agent counted the money that Hadjiev had paid him that day for the Rolex watch and learned that Hadjiev had only given the UCE $2,900.  The UCE contacted Hadjiev via What's App, told Hadjiev that the money was short $100, and Hadjiev agreed to pay the UCE another $50 when they met the following day.

9.   Recording and testimony about the April 26, 2018 sale of purportedly stolen watches to defendant Dimitre Hadjiev by the UCE.

FBI agents and the UCE will testify to the following: On April 26, 2018, at the direction of the FBI, the UCE returned to defendant Dimitre Hadjiev's store at 330 South Street in Philadelphia, PA and met with Hadjiev.  Hadjiev paid the UCE $4,500, the remainder of the money owed from the purportedly stolen watch that Hadjiev had purchased the day before.  The UCE the offered Hadjiev two additional purportedly stolen watches for sale, both watches that

14

had been purchased by the FBI from Rolex USA: (1) men's Rolex Oyster Perpetual Day-Date, with black dial, Serial No. J5280381, that the UCE had shown to Hadjiev the day before; and (2) men's Rolex Oyster Perpetual Day-Date with champagne dial, 40 mm Chronometer Chronergy, Model M228238-0006, Serial No. 3192K5T0, retail value of $34,850.  Hadjiev agreed to purchase both watches for $17,000, but told the UCE that he needed to get the money from the bank and asked the UCE to come back. During this meeting, the UCE told Hadjiev that he had to go back out of town, but that he could come back to Philadelphia the following week.  The recording of this meeting, as well as photos of the two watches sold to Hadjiev that day, will be offered as evidence.

          10.    Testimony about the second meeting on April 26, 2018 between defendant Dimitre Hadjiev and the UCE.

The UCE will testify to the following:" His recording device did not work for the second meeting on April 26, 2018.  During that meeting, Hadjiev paid him $17,000 for the two purportedly stolen watches that he sold to Hadjiev that day.  When he asked if Hadjiev needed something else, Hadjiev told him that he needed a gold or two-tone silver and gold Rolex Sky-Dweller.

          11.    Instagram posting by Dimitre Hadjiev viewed on May 2, 2018

An FBI agent will testify about viewing an Instagram posting by dimitrethejeweler – Dimitre's Ice Fire Inc on May 2, 2018, which was a short video of two Rolex gold watches with a caption of: "Clean !! symbol, symbol, symbol #southstreetphilly #beverlyhills #belair #rodeodrive #jewelersrowphiladelphia #dimitresicefireinc #daydate40mm #2018."  The video and a screenshot from that video will be offered as evidence.

15

12.     Recording and testimony about the May 7, 2018 visit to Hadjiev's store by an undercover officer ("UC2") and the CS

FBI agents, UC2 and the CS will testify to the following: UC2 and the CS went to Hadjiev's store on May 7, 2018, at FBI direction, to purchase one of the watches shown on Hadjiev's Instagram posting that had been seen on May 2, 2018 with $23,000 in cash obtained from the cashing of an official FBI check for use in this purchase. The CS told Hadjiev that s/he wanted to purchase a Rolex and showed Hadjiev the Instagram photo. Hadjiev took a gold Rolex off his wrist to show the CS. Hadjiev told the CS that the price of the Rolex was $29,000, and the CS agreed to return the next day to purchase the watch for $29,000 in cash. The recording and the CS's cell phone with the Instagram photo will be offered as evidence.

13.     Recording and testimony about the May 8, 2018 visit to Hadjiev's store by UC2 and the CS

FBI agents, UC2 and the CS will testify to the following: UC2 and the CS again went to Hadjiev's store, at FBI direction, on May 8, 2018 to purchase the Rolex watch that Hadjiev had shown them the previous day with $30,000 in cash obtained from the cashing of an official FBI check for use in this purchase. The CS purchased a Rolex watch from Hadjiev for $29,000 in cash and Hadjiev did not provide a receipt or request any identification information from the CS. This meeting was recorded, and the recording, the watch purchased by the CS, and a photograph of that watch will be offered into evidence.

14.     Hadjiev's cash deposits into the Ice Fire Inc. Wells Fargo Bank account, account number ending in 2480, on May 9 and 10, 2018

Am FDIC representative will testify that, in 2017 and 2018, Wells Fargo Bank was insured by the Federal Deposit Insurance Corporation ("FDIC") and was a bank that operated in the United States. The court has ruled as to the authenticity and admissibility of Wells Fargo

Bank records, including account opening documents and account statements and deposit records for the Ice Fire Inc. account ending in 2480.  IRS Special Agent Eric Updike will testify that he reviewed the May 2018 statement and deposit records for the Ice Fire Inc. account ending in 2480, which showed a cash deposit on May 9, 2018 of $9,900, and a cash deposit on May 10, 2018 of $7,250.  The account opening documents, the Wells Fargo Bank statements and deposit records for the Ice Fire Inc. account ending in 2480 will be offered into evidence.

> 15.     Hadjiev's failure to file an IRS Form 8300/FinCEN Form 8300 for the receipt of $29,000 in cash from the CS on May 8, 2018 for the purchase of the Rolex watch

A representative from the Financial Crimes Enforcement Network ("FinCEN") will testify about the mission and responsibilities of FinCEN, and explain the purpose and requirements for a FinCEN Form 104 (Currency Transaction Report or CTR) and IRS Form 8300/FinCEN Form 8300 (Report of Cash Payments over $10,000 Received in a Trade or Business), and explain when and how such forms must be completed.  The representative will testify about CTRs filed with FinCEN by Bank of America, TD Bank and Wells Fargo Bank for Ice Fire Inc. accounts with those banks.  The representative will also testify that FinCEN did a search of its records for an IRS Form 8300/FinCEN Form 8300 filed by Ice Fire Inc. or Dimitre Hadjiev for a cash payment of over $10,000 on May 8, 2018 and no such record was found, nor was any record of any IRS Form 8300/FinCEN Form 8300 filed by Ice Fire Inc. or Dimitre Hadjiev found. An exemplar IRS Form 8300/FinCEN Form 8300 and FinCen Form 104 Currency Transaction Report will be offered into evidence, as well as the CTRs filed by Bank of America, TD Bank, and Wells Fargo Bank for the accounts of Ice Fire Inc. with those banks.

16.     September 2018 communications between the UCE and defendant Hadjiev

An FBI agent will testify that photographs of Rolex watches in the window of a jewelry

store in Marlton, NJ, including a Sky-Dweller, were taken on September 14, 2018 and were

provided to the UCE.  The UCE will testify about text message communications that he had with

defendant Dimitre Hadjiev in September 2018 about bringing a Rolex Sky-Dweller and other

watches to Hadjiev, including the following text message from the UCE: "kool…once dust

settles from the rip….I'll come through…[thumbs up symbol]," to which Hadjiev responded

with a happy face symbol.  The photographs of the Rolex watches in the Marlton, NJ jewelry

store window taken on September 14, 2018, and the text messages exchanged between the UCE

and defendant Dimitre Hadjiev on September 6 and 18, 2018 will be offered into evidence.

17.     Testimony about the December 19, 2018 purchase of two Rolex watches
         by the FBI

An FBI agent will testify that, on December 19, 2018, the FBI purchased from Bernie

Robbins Jewelers in Marlton, NJ two Rolex watches, for $74,400 plus sales tax.  The watches

purchased were: (a) a men's Rolex 18k white gold Sky-Dweller-GMT-Annual Calendar, with

black dial and black strap, Model M326139-0002, Serial No. 031280H8, with a retail value of

$39,550; (b) a men's Rolex 40 mm 18k yellow gold Day-Date with 18k yellow gold President

bracelet, Model M228238-0002, Serial No. C292M306, with a retail value of  $34,850.  The

receipt for the purchase of the two watches and photographs of the watches will be offered into

evidence.

18.     Recording and testimony about the January 23, 2019 sale of purportedly
         stolen watches to defendant Dimitre Hadjiev by the UCE

FBI agents and the UCE will testify to the following:  On January 23, 2019, at the

direction of the FBI, the UCE went to defendant Dimitre Hadjiev's store at 330 South Street in

Philadelphia, PA and met with Hadjiev to offer Hadjiev three purportedly  stolen watches for

sale, the two watches that had been purchased by the FBI from Bernie Robbins Jewelers in

Marlton, NJ on December 19, 2018: (a) a men's Rolex 18k white gold Sky-Dweller-GMT-

Annual Calendar, with black dial and black strap, Model M326139-0002, Serial No. 031280H8,

with a retail value of $39,550; (b) a men's Rolex 40 mm 18k yellow gold Day-Date with 18k

yellow gold President bracelet, Model M228238-0002, Serial No. C292M306, with a retail value

of  $34,850; and one of the watches purchased from Rolex USA, in New York, NY, on  March

24, 2017: a men's Rolex Oyster Perpetual Day-Date with silver dial, 40 mm Chronometer

Chronergy, Model M228238-0008, Serial No. 0L289269, with a retail value of $34,850.  Hadjiev

purchased the three watches for $17,000 in cash. The recording and photographs of the three

watches will be offered into evidence.

    19.    Testimony by FBI and IRS Special Agents about the search conducted at
defendant Dimitre Hadjiev's store on August 22, 2019 and the items recovered
during that search

FBI and IRS Special Agents will testify about the search of defendant Dimitre Hadjiev's

store, located at 330 South Street, Philadelphia, PA, on August 22, 2019 and the items recovered

during that search, including documents, watches and watch parts.

    20.    Testimony by TD Bank representatives about the TD Bank accounts of Dimitre
Hadjiev, account number ending in 3450, and Ice Fire Inc., account number
ending in 5232

An FDIC will testify that, in 2015 and 2016, TD Bank was insured by the FDIC and was

a bank that operated in the United States.  The Court has ruled as to the admissibility and the

authenticity of the TD Bank records, including account opening documents and account

statements and deposit records for the Dimitre Hadjiev account ending in 3450, and Ice Fire Inc.

account ending in 5232, and the account closing letters for those accounts dated April 15, 2016.

The account opening documents, the TD Bank statements and deposit records, and the closing letters dated April 15, 2016 for the Dimitre Hadjiev account ending in 3450 and Ice Fire Inc. account ending in 5232 will be offered into evidence.

TD Bank employee David Sagers will testify that he worked for TD Bank in various capacities for over thirteen years, he is currently a Check Fraud Team Manager for TD Bank, and that, from March 2014 through June 2016, he was an Assistant Branch Manager at the Society Hill, Philadelphia branch of TD Bank, located at 200 Lombard St., Philadelphia, PA.  Mr. Sagers will testify that he has memory issues due to long COVID, but through past recollection recorded, he will testify that he was asked to contact Ice Fire Inc. in December 2015 by TD Bank's Anti-Money Laundering department to ask specific questions about Ice Fire Inc.'s transactional activity, including sources of funds and international wires. Sagers called the number listed on the Ice Fire Inc. account (267.258.1360) and spoke to someone who identified himself as "Dimi," discussed TD Bank's Anti-Money Laundering policy with "Dimi" -- that, if more than $10,000 in cash was deposited in a single day, the transaction must be reported to the IRS, and, if the deposits were just below $10,000, then the bank would have to follow up on the reasoning of why the deposits were structured.

21.    Testimony by a Citizens Bank representative about the Citizens Bank account of Dimitre's Ice Fire Inc., account number ending in 4140

Am FDIC representative will testify that, between 2018 and 2019, Citizens Bank was insured by the FDIC and was a bank that operated in the United States.  The Court has ruled as to the admissibility and authenticity of the Citizens Bank records, including account opening documents and account statements and deposit records for the Dimitre's Ice Fire Inc. account ending in 4140.  The Citizens bank records will be offered into evidence.

22.     Testimony by a Bank of America ("BOA") representative about the BOA account of Ice Fire Jewelry Inc., account number ending in 0550

A BOA representative may testify that, between 2011 and 2014, BOA was insured by the FDIC and was a bank that operated in the United States.  The representative will also testify as to the authenticity of the BOA records, including the BOA FDIC certificate, account opening documents and account statements and deposit records for the Ice Fire Jewelry Inc. account ending in 0550.  The BOA bank records will be offered into evidence.

23.     Testimony by IRS Special Agent Eric Updike about deposits made into bank accounts controlled by Hadjiev, and comparison of those deposits with receipts and other documents recovered during the search of Hadjiev's store on August 22, 2019

IRS Special Agent Eric Updike will testify about his review of the following bank account records: (a) Hadjiev's TD Bank account, ending in 3450; (b) Ice Fire Inc.'s TD Bank account, ending in 5232 (c) Ice Fire Inc.'s Wells Fargo Bank account, ending in 2480, and Dimitre's Ice Fire Inc. Citizens Bank account, ending in 4140. He will testify about the cash deposits of $10,000 or less made into those accounts between March 2016 and November 2018. Special Agent Updike will present summary charts of these cash deposits documented in the bank records.  Special Agent Updike will also testify about his review of financial documents recovered during the search of Hadjiev's business at 330 South Street in Philadelphia, PA on August 22, 2019 and his comparison of those documents with the above-listed bank records. Special Agent Updike will also provide expert testimony with respect to the required filing under federal law of forms for the receipt of cash payments over $10,000 by a business, the required filing under federal law of forms for bank deposits or withdrawals of more than $10,000 in a single day by a financial institution, and structuring of cash deposits into bank accounts.  He will testify that: (1) under federal law, a person engaged in a nonfinancial business, such as defendant

Hadjiev, who receives more than $10,000 in cash in a transaction, is required to file an IRS Form 8300/FinCEN Form 8300 with the Financial Crimes Enforcement Network "FinCEN") within 15 days of that cash transactions; (2) no IRS Form 8300/FinCEN Form 8300 was filed for Hadjiev's sale of the Rolex watch to the CS on May 8, 2018 for $29,000 in cash; (3) under federal law, financial institutions are required to report cash deposits and withdrawals of more than $10,000 in a single day by filing a FinCEN Form 104 (CTR); and (4) defendant Hadjiev's patterns of cash deposits into his bank accounts between March 2016 and November 2018 are consistent with structuring to avoid bank reporting requirements, in violation of 31 U.S.C. §§ 5324(a)(1) and (a)(3).

24.     Testimony of Xavier Bolonski.

Xavier Bolonski will testify that he is with JB&B Associates in Philadelphia, PA and that was Dimitre Hadjiev's accountant from approximately March 2016 until sometime in 2019.  He will testify that: (1) he prepared tax returns for Ice Fire Inc. for Dimitre Hadjiev for the years 2016 through 2018, and prepared Hadjiev's personal tax return in 2016; (b) Hadjiev showed him letters from TD Bank and Wells Fargo, each letter concerning Ice Fire Inc. banking activity and informing Hadjiev that the bank account would be closed in 60 days; (c) he reviewed each of the letters around the time that Hadjiev received them and told Hadjiev on both occasions to make his cash deposits over $10,000 to rectify the problem; (d) he advised Hadjiev to make his deposits and to fill out the currency transaction reporting forms with the banks; (e) he knew that Hadjiev didn't listen to this advice based on his review of Hadjiev's Wells Fargo and Citizens Bank records; and (f) he learned from Hadjiev that both TD Bank and Wells Fargo closed  the Ice Fire Inc. accounts.

25.     Testimony of Jabril Logan

Jabril Logan will testify that he worked for Dimitre Hadjiev as a security guard at Hadjiev's business at 330 South Street in Philadelphia from January 2016 until August 22, 2019. He will testify that: (a) no other employees worked at the store with Hadjiev; (b) once in a while, Hadjiev's sister covered and manned the desk for a few hours; and (c) he never saw Hadjiev's father at the store.

26.     Testimony of Cooperating Witness #2

Cooperating Witness #2 will testify that he lived on the same floor of the Federal Detention Center as Hadjiev in  2020 and Hadjiev told him that Hadjiev only deposited $9,000 in the bank so he could "fly low," but deposited higher amounts here and there to make it look good.

27.     FBI Special Agents Matthew Yaeger or Scott Friedenreich

Special Agent Yaeger or Special Agent Scott Friedenreich will testify about their participation in the execution of the search warrant at Hadjiev's business at 330 South Street, Philadelphia, PA on August 22, 2019, and that they collected the watches on display in the front window of the business and the three display cases in the business that were seized from the store as evidence.

28.     Rolex watchmaker Ryan Volker

Mr. Volker will testify as an expert witness about his examination of watches with Rolex marks recovered from Hadjiev's business and his opinion as to whether each of these watches is a genuine Rolex watch, is a watch that is not of Rolex manufacture, or is a watch with parts that are not of Rolex manufacture.  He will also testify about the serial number, movement number and model number, if found, on each watch and that that each new Rolex watch sold by

Rolex Watch, U.S.A. is engraved on some part of the watch with a unique serial number and movement number. In addition, Mr. Volker will testify about his examination of Gov't Exhibit 163 (the Rolex watch purchased by the CS from Hadjiev on May 8, 2018), and will offer his opinion that the watch is a genuine Rolex watch, that the serial number on the watch had been mostly removed.  He will also testify that he did a Rolex database check of movement number and the database entry for that movement indicates that the Rolex serial number for that watch is 3192K5T0.

      29.    Rolex Vice President Marc Esposito

      Mr. Esposito will testify as an expert witness about trademarks held by Rolex, including the word Rolex, the crown design, the words Oyster, Oyster Perpetual, DateJust, Submariner, Sky-Dweller, GMT-Master and Rolex Daytona.  Mr. Esposito will also testify about the importance of Rolex trademarks to Rolex and that the Rolex marks on the watches and watch parts recovered from Hadjiev's store that are not of Rolex manufacture are likely to confuse members of the public.

      30.    FBI Special Agent Jason Palek

      Special Agent Palek will testify that he is a forensic computer analyst with FBI Regional Computer Forensic Laboratory ("RCFL") and that he examined an iPhone and iPad recovered from Hadjiev's store during the execution of the search warrant on August 22, 2019. Copies of his reports will be offered into evidence.

      31.    FBI Special Agent

      An FBI Special Agent will testify about text messages and emails recovered from defendant Hadjiev's iPhone through the RCFL examination.  Text messages and emails sent and received by Hadjiev will be offered into evidence.

32.     FBI Special Agent

An FBI Special Agent will testify that FBI agents conducted a consensual interview of defendant Dimitre Hadjiev on August 22, 2019 and that the interview was recorded. Portions of that recorded interview will be offered into evidence.

33.     Representative from Federal Detention Center – not needed as defendant has stipulated to the admissibility of defendant's recorded telephone calls at the Federal Detention Center.

34.     FBI Special Agent

An FBI Special Agent will testify that: recorded calls made by defendant Dimitre Hadjiev, while Hadjiev resided at the FDC were provided by the FDC pursuant to a subpoena, a number of those calls were in Bulgarian; several calls in Bulgarian between defendant Hadjiev and one of his sisters, A.H., were submitted for translation by an FBI Bulgarian linguist; and the agent recognized the voices of Hadjiev and his sister on the calls.

35.     FBI Bulgarian Linguist

The defense has stipulated to the accuracy of the English translation of portions of FDC several calls in Bulgarian. A portion of an FDC-recorded calls made by defendant Dimitre Hadjiev on August 30, 2019 will be played and the English translation transcript of that portion of the call will be offered into evidence.  If defendant Hadjiev testifies at trial, portions of additional calls in Bulgarian from July 24 and 31 and August 10, 2020 may be played, with the English translation transcripts offered into evidence in the government's rebuttal case. The government will file a motion to admit these transcripts, if needed.

## IV.   **STIPULATIONS**

The government has proposed stipulations to streamline the trial for the Court's and jury's convenience.

## V.   **WITNESSES AND EXHIBITS**

### A.   **Witnesses**

The government may call the witnesses identified in Attachment A to this memorandum. The government has identified in Attachment A the witnesses that it intends to call at trial, the witnesses that are subject to call depending on issues that may arise at trial, and the witnesses for whom the government is seeking stipulations.[1]

The government requests that a testifying witness not be identified by name at trial at the request of the FBI due to safety concerns: the UCE, who is still an active undercover agent.  Use of his/her name could allow defendant and others observing the trial to learn additional information about this witness and jeopardize his/her undercover work.  *See, e.g., Nelson v. Crowley,* 2009 WL 498909, at *5 (S.D.N.Y. Feb.23, 2009) (finding that allowing an undercover officer to testify anonymously for safety reasons did not violate the Confrontation Clause's prohibition against anonymous accusers and absentee witnesses).  The government will ask the Court to give a jury instruction that the anonymity of this witness is related to the general nature of his/her work and related safety concerns.

The government reserves the right to call rebuttal witnesses in the event the defendant elects to present a defense case.

---

[1] The government seeks permission to amend its witness list if factual or legal issues arise prior to or during trial which the government had not anticipated.

### B.   Exhibits

The government intends to introduce the exhibits identified in Attachment B to this memorandum.  The government reserves the right to supplement its exhibit list as may be required.

## VI.   ESTIMATED LENGTH OF TRIAL

The government anticipates that the trial will take up to approximately seven to nine trial days.

## VI.   LEGAL ISSUES

### A.   Business Records/Public Records

The government will introduce certified copies of business records pertaining to the AT&T telephone numbers for which Hadjiev and J.G. (identified in text messages as "Kika"), and bank account opening documents, statements and other records for Hadjiev's business accounts with Bank of America, TD Bank, Wells Fargo Bank and Citizens Bank.  The records are admissible under Fed. R. Evid. 803 and 902. A motion in limine has been granted.

### 2.   Sealed and signed government records

The government will also seek to introduce sealed and signed U.S. Trademark Registrations for trademarks held by Rolex Watch U.S.A., Inc.  Under Federal Rule of Evidence 902(1), these Trademark Registrations "are self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted  as they are "document[s] that bear[]: (A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; . . . or a department, agency or officer of any entity named above; and (b) a signature purporting to be an execution or attestation. Fed. R. Evid. 902(1).

Accordingly, the business and certified records at issue in this case are admissible

27

pursuant to Rules 803 and 902.

###    D.    Use of Agents' Reports to Cross-Examine Witnesses

The government has provided to the defense an abundance of reports of witness interviews by government agents.  To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents.  However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports or notes.  *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried.  *Id*. at 28.  One defendant sought to impeach the agent by admitting interview notes taken by an Assistant United States Attorney who had interviewed the agent as a prior inconsistent statement.  *Id*. at 28-29.  The district court rejected the effort and the Second Circuit affirmed, holding that the prosecutor's notes were not the agent's statement, but merely a third party's characterization of the agent's statement, and therefore irrelevant as an impeaching prior inconsistent statement and consequently inadmissible:

> We have held, however, that a third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization.  .  .  .  Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words.  The problem, in essence, is one of relevancy.  If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id*. at 29 (citation omitted).

As a matter of evidence, the burden of proving that reports and notes reflect the witness' own words rather than the note-taker's characterization falls on the party seeking to introduce the

notes.  *Id*.  Thus, a party seeking to use a report to impeach bears the burden of proving a rational

basis for concluding that the report either was adopted by the witness or represents the verbatim

transcript of the witness's statement.  *See id.* at 30.  In the absence of such proof, cross-

examination from such reports should be carefully scrutinized so that a statement that is

otherwise inadmissible is not back-doored into evidence and read into the record.  *See also*

*United States v. Shoenborn*, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993).  In this case, the

defendants should not be permitted to admit reports to impeach the underlying subjects of those

interviews, or cross-examine witnesses using any portion of the reports.

### E.      Summary Charts

Much of the physical evidence in this case consists of bank records, and other financial

records and watches recovered from defendant Hadjiev's store during the execution of the search

warrant at the store on August 22, 2019.  The government intends to introduce into evidence

summary charts of this voluminous evidence, in particular, summary charts of bank transactions,

particularly cash deposits, for Hadjiev's bank accounts,  summary charts of receipts and other

documents, as well as a summary chart of watches with Rolex trademarks,  recovered from

Hadjiev's store during the execution of the search warrant on August 22, 2019.

Under Federal Rule of Evidence 1006, summary charts are admissible if they are based

upon evidence that is: (i) voluminous, (ii) admissible, and (iii) available to the opponent. Fed. R.

Evid. 1006; *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990).  Although much of

the evidence underlying the government's summary charts will, in fact, be offered for admission,

it is not necessary that all of the evidence depicted in the charts be admitted as long as it is

otherwise admissible.   "It is well established that summary evidence is admissible under Rule

1006 only if the underlying materials upon which the summary is based are admissible." *United*

29

*States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa 2005) (citing *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir.1992)).

In addition to summaries of voluminous evidence, the government may also rely upon charts or summaries as educational devices.  *See  Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices").  Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id.*  In this case, charts will be essential in order to demonstrate how several pieces of evidence meld together at a particular time to prove the charged offenses.

### F.    Summary Witnesses

The government will use IRS Special Agent Eric Updike, Ryan Volker and FBI special agents in connection with the presentation of the evidence described above.  Such testimony is properly admitted under Federal Rule of Evidence 1006 to describe the contents of voluminous writings, recordings, or photographs that cannot conveniently be examined in court.  *See United States v. Haidara*, 112 F.3d 511, 2007 WL 205378 *2 (4th Cir. 1997) (unpub. op.).  In this case, there are numerous financial transaction documents and invoices, as well as watches with Rolex trademarks.  This evidence is voluminous by any definition, and their individual examination in court would, at a minimum, be inconvenient and time-consuming.  Thus, summary testimony is both necessary and appropriate under Rule 1006.

Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. *Id.*  Here, there is a large body of documents and other evidence within the purview and knowledge of the

agents.  As such, they may testify about and summarize that material.  *United States v. Moore*, 997 F.2d 55, 57-59 (5th Cir. 1993).  As long as the material summarized is in evidence, any underlying assumptions are made explicit, and the witness is available for cross-examination, summary testimony is appropriate.  *See id.; see also Haidara*, 112 F.3d at *2.

### G.      Recalling Witnesses

The government intends to recall witnesses, including FBI Special Agents James Finnegan and Lauren Almonzar Carter, Task Force Officer John Benham, and IRS Special Agent Eric Updike during its case-in-chief.  The items of proof to be offered by the witnesses will often relate to different segments of proof, and different topics.  For example, TFO Benham and SAs Finnegan and Carter will testify about a number of different events during the investigation of defendant Hadjiev.  SA Updike will testify about various aspects of defendant Hadjiev's financial transactions and documentation.

In order to promote an efficient and clear presentation of the case, the government proposes to recall some of its agents so that their testimony can be provided in parts, either by subject matter, or chronologically, as required for a straightforward presentation of the case.[2] This procedure has been widely endorsed in complex cases.  *See United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977) (circuit court complimented the district court's exercise of its discretion as lending "a praiseworthy degree of order to this complicated trial").  *See also United States v. Edelin*, 128 F. Supp.2d 23, (D.D.C. 2001) (collecting cases involving complex conspiracies or activities occurring over a long period of time that have approved of the practice of recalling witnesses to testify to discrete incidents).  Given the complexities of this case, a

---

[2]  The government will make every effort to have the witnesses testify the least number of times possible.

similar procedure should be permitted here.  The presentation of the evidence in this case is more understandable when it tracks the numerous transactions in as topical a manner as possible. To accomplish this, the agents may need to testify at different times regarding particular aspects of the charges against defendant Hadjiev.

### H.    Admissibility of Consensual Recordings

The government intends to introduce consensually recorded conversations between defendant Hadjiev and others, including the CW, UCE, UC2, the CS, FBI agents John Benham, and Lauren Almanzor Carter, and Hadjiev's sister.  These recorded statements are admissible against defendant Hadjiev as admissions of a party opponent and statements against interest, pursuant to Fed. R. Evid. 801(d)(2)(A), as non-hearsay, and pursuant to Fed. R. Evid. 804(b)(3), as an exception to the rule against hearsay.  These statements are highly probative of the defendant's intent, knowledge and *modus operandi*.

Under Federal Rule of Evidence 801(d)(2)(A), statements made by a party and offered against that party are admissible.  *See e.g., Savarese v. Agriss*, 883 F.2d 1194, 1201 (3d Cir. 1989) (since the statement is that of the party himself, he can hardly be heard to complain that he cannot cross-examine himself as to his own utterances); *see also McGlory*, 968 F.2d 309, 335 n. 17 (3d Cir. 1992).  Therefore, the government may offer the defendant's statements in the consensual recording against him as admissions by a party-opponent, under Fed. R. Evid. 801(d)(2)(A), or as a statement against interest under Fed. R. Evid. 804(b)(3).

The statements of the person to whom the defendant is speaking are not hearsay because they are being not offered for the truth of the matter.  Instead, those statements provide proper context for the defendant's statements.  Without the other side of the conversations, compelling

evidence of the defendant's participation in the conspiracy would be incomprehensible.[3]  *See, e.g., United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005) (recorded conversations with an unavailable informant are admissible as party admissions; unavailable informant's statements are admissible, not for the truth of the matter, but to provide context to defendant's statements).  The recorded conversations in this case were consensually recorded on different media and have been transferred to digital form for ease of presentation at trial.  The foundation that must be laid for the introduction into evidence of recorded conversations is a matter largely within the discretion of the trial court.

In this case, the other parties to the recorded conversations, with the exception of the portions of recorded FDC calls, will testify to the recorded conversations.  In addition, an FBI agent is available to testify regarding the voices on the recordings, the handling of the consenting party during the recorded conversation, and the circumstances surrounding the recorded conversation with defendant Hadjiev.  As such, the government may introduce statements of defendant Dimitre Hadjiev through the consensual recordings.

A lay witness, such as an undercover agent or cooperating witness, may explain unfamiliar terms contained in a recorded conversation involving the intricacies of the criminal activity at issue, even when such matters are central to the facts at issue.  Fed. R. Evid. 701.

The "rule of completeness" set forth in Federal Rule of Evidence 106 applies where one party seeks to introduce a misleadingly tailored snippet of a statement that creates a misleading impression by being taken out of context.  *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988).  It is entirely proper, however, to admit segments of a statement without including everything, and adverse parties are

---

[3]  The jury should be properly instructed regarding the admissibility of the statements.

not entitled to offer additional statements just because they are present in the same recording and the proponent has not offered them.  Significantly, Rule 106 does not render admissible evidence which is otherwise inadmissible under the hearsay rules.  Id.

### H.   Transcripts

For recordings in the English language, the recording itself is the evidence and a transcript of the recording may be provided to the jury in open court as an aid in following the conversation.  *See, e.g., United States v. Salvo,* 34 F.3d 1204, 1220 (3d Cir.1994); *United States v. Estavez,* 2013 WL 3196421, at *2 (E.D. Pa. June 25, 2013 ).   When the transcript is a translation from a foreign language into English, however, the transcripts of the English translations themselves are also evidence, in addition to the recordings.  *Estavez,* 2013 WL 3196421, at *2; *see also* Third Circuit Model Criminal Jury Instructions, No. 4.07).

### I.   Defense Use of Defendant's Statements

As noted above, the government in this case will present a variety of evidence as admissions of a party opponent under Fed. R. Evid. 801(d)(2).  Such evidence is, by definition, not hearsay as to that party.  Fed. R. Evid. 801(d).  Thus, for example, emails may be admitted against the party who wrote them, *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them.  *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).  Such statements, however, may not be admitted by the party who gave them, because Rule 801(d)(2) does not allow a party "to introduce his or her *own* statements through the testimony of other witnesses."  *Id.* (emphasis in original). Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  *Id.  See also United States v. Palow*, 777

F.2d 52, 56 (1st Cir. 1985) (requirement that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (a party's statement, if offered against him, is not hearsay under Rule 801(d)(2)(A), but is hearsay and not admissible if offered by the party himself).

In this case, some consensually recorded conversations containing statements of defendant Hadjiev will be introduced by the government. This does not mean that Hadjiev will be able to do likewise.  Similarly, statements that Hadjiev made in emails, text messages and orally to agents, are not admissible by Hadjiev.  It does not matter whether the information that the party seeks to admit is inculpatory or exculpatory.  In either case, a party simply cannot admit his or her own statements as admissions of a party opponent.  *United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (upholding district court's ruling that tape recording of a conversation between a codefendant and a government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).  *McDaniel*, 398 F.3d 545, n.2.

### K.      Reference to Punishment for Charged Offenses

The punishment for the offenses charged is not a proper matter for the jury's consideration.  *See Shannon v. United States*, 512 U.S. 573 (1994); *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *United States v. Austin*, 533 F.2d 879, 885-86 & n.14 (3d Cir. 1976); *see generally* 1 L. Sand, J. Siffert, W. Loughlin, and S. Reiss, *Modern Federal Jury Instructions -- Criminal* 9.01 (1993).  It is well settled that, "presenting information to the jury about possible sentencing is prejudicial."  *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980).  Questioning and argument addressing these issues, thus, would be improper.  Evidence should be excluded where it is irrelevant to the issue being tried or where it will "induce the jury

35

to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citation omitted). Accordingly, references by defense counsel or witnesses to punishment for the offenses charged should not be permitted.

### L.   Motion to Preclude Reference to Defendant's Background

The government had moved to preclude defense counsel from making reference to the defendant's biographical history, work history and family circumstances in the defense opening statements to the jury unless defense counsel will present competent evidence to substantiate those statements.  The Court has ruled on that motion.

### M.   Cross-Examination of Defendant's Character Witnesses

On cross-examination of defendant's character witnesses, the government may inquire into specific instances of defendant's past conduct relevant to the character trait at issue.  Fed. R. Evid. 405(a); *Michelson v. United States,* 335 U.S. 469, 479 (1948).

### N.   Forfeiture

The second superseding indictment and the Bill of Particulars filed on March 24, 2021 give notice that the government will seek to forfeit the following: (1) property involved in the violation of 18 U.S.C. § 1956, and property traceable to such property, including $29,000 in United States currency;  (2) property involved in the violation of 31 U.S.C. 5324, and any property traceable to such property, including $978,266 in United States currency; and (3) related to the violations of 18 U.S.C. § 2320, including all property specified in the Bill of Particulars: (a) articles, the making or trafficking of which is prohibited under that statute; property used, or intended to be used, to commit or facilitate the commissions of a violation of that statute; (c) property constituting or derived from proceeds obtained directly or indirectly as a

36

result of the commission of a violation of that statute.  The defendant has elected that the forfeiture determination will be made by the Court.

Because forfeiture is part of sentencing, it is the government's burden is to establish the forfeitability of the property by a preponderance of the evidence.  *See United States v. Bader*, 678 F.3d 858, 893-94 (10th Cir. 2012); *United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011) ("government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence").  *See also United States v. Voigt*, 89 F.3d 1050, 1083 (3d Cir. 1996) (reaffirming reasonable doubt standard for RICO forfeiture because scope of forfeiture is greater under RICO than under section 982, but holding that the preponderance standard applies to money laundering).

The Rules of Evidence do not apply in the forfeiture phase of the trial and hearsay is admissible.  The forfeiture determination may be based on evidence already in the record and on any additional evidence or information submitted by the parties.  Fed. R. Crim. P. 32.2(b)(1)(B). Because hearsay is admissible in most sentencing proceedings, and the forfeiture phase of the trial is considered a part of the sentencing process, hearsay likewise is admissible in the forfeiture phase of the trial.  *See United States v. Smith*, 770 F.3d 628 (7th Cir. 2014); *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

O.      **Affirmative Defense of Entrapment**

In his proposed jury instructions, the defendant raised the affirmative defense of

entrapment.  The government has filed a motion *in limine* to preclude this defense

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

___/s K.T. Newton_____
K.T. NEWTON
Assistant United States Attorney

November 13, 2022

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Revised Trial

Memorandum has been served this date by electronic filing:

> Daniel Cevallos, Esquire
> Peter J. Scuderi, Esquire
> Daniel Pell, Esquire
> *Attorneys for defendant Dimitre Hadjiev*

> ___/s K.T. Newton___
> K.T. NEWTON
> Assistant United States Attorney

Dated: November 13, 2022