## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | **CRIMINAL NO. 19-548** |
| : | |
| **DIMITRE HADJIEV** : | |

### MEMORANDUM OPINION

Rufe, J.                                                                                                                                    May 31, 2023

On November 23, 2022, a jury found Defendant Dimitre Hadjiev guilty of one count of failure to file a record of a financial transaction, in violation of 31 U.S.C. § 5324(b)(1) (Count 2); two counts of structuring transactions with one or more domestic financial institutions to evade reporting requirements of the financial institutions, in violation of 31 U.S.C. § 5324(a)(3) and (d)(2) (Counts 3 and 24); and one count of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320(a) (Count 4).[1] Defendant has filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and/or for a new trial under Federal Rule of Criminal Procedure 33.[2] For the reasons stated below, Defendant's motion will be denied.

### I.   LEGAL STANDARDS

#### A.  Motion for Judgment of Acquittal

In ruling on a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), the district court must view the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found proof of

---

[1] Jury Verdict Form [Doc. No. 270]. Defendant was acquitted on one count of money laundering (Count I), and 13 counts of structuring (Counts 5 through 7, 10 through 15, 17, 19, 21, and 23).

[2] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279].

guilt beyond a reasonable doubt based on the evidence presented at trial.[3] In conducting the sufficiency inquiry, a court does "not view the government's evidence in isolation, but rather, in conjunction and as a whole," and will draw all reasonable inferences in favor of the decision of the jury.[4] "The fact that alternative inferences exist is irrelevant."[5] The Court must sustain the jury's verdict if there is substantial evidence to uphold the decision.[6] The prosecution may satisfy its burden entirely through circumstantial evidence.[7] Under this particularly deferential standard of review, the Court "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [its] judgment for that of the jury."[8] Accordingly, a finding of insufficiency should be "confined to cases where the prosecution's failure is clear."[9]

### B. Motion for a New Trial

Under Federal Rule of Criminal Procedure 33, the trial court may grant a new trial when there is a finding of trial error, including the introduction of prejudicial testimony, or when the trial court does not believe that the evidence supports the jury's verdict.[10] When a district court evaluates a Rule 33 motion for a new trial on the ground that the verdict was contrary to the weight of the evidence, it does not view the evidence favorably to the Government, but instead

---

[3] *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (internal quotation marks and citation omitted).

[4] *United States v. Claxton*, 685 F.3d 300, 313 (3d Cir. 2012) (quoting *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir.1992)).

[5] *Boria*, 592 F.3d at 486 (Fisher, J., concurring) (citing *Iafelice*, 978 F.2d at 97 n.3).

[6] *United States v. Trant*, 924 F.3d 83, 93 (3d Cir. 2019) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc)).

[7] *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (citation omitted).

[8] *United States v. Burnett*, 773 F.3d 122, 135 (3d Cir. 2014) (quoting *Caraballo–Rodriguez*, 726 F.3d at 430).

[9] *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002)).

[10] Fed. R. Civ. P. 33; *United States v. Brodie*, 268 F. Supp. 2d 420, 424 (E.D. Pa. 2003) (quoting *United States v. Dixon*, 658 F.2d 181, 193 (3d Cir.1981)).

exercises its own judgment in assessing the Government's case.[11] A "district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted."[12]

## II.     DISCUSSION[13]

Defendant argues that the Government relied on circumstantial evidence that "amount[ed] only to reasonable speculation," and that there was insufficient evidence to sustain the jury's verdict of guilty for Counts 2, 3, 4, and 24.[14]

### A. Count 2

Count 2 of the Second Superseding Indictment charged that Defendant violated 31 U.S.C. § 5324 by willfully causing his jewelry business, Ice Fire Inc.,[15] to fail to file with the Financial Crimes Enforcement Network ("FinCEN") a required form reporting a cash transaction of $29,000.[16]

The government presented evidence to the jury that under federal law, nonfinancial businesses[17] are required to report to the federal government cash payments of more than

---

[11] *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002); *United States v. Stillis*, No. 04-680-03, 2007 WL 2071899, at *3 (E.D. Pa. July 16, 2007), *aff'd*, 437 F. App'x 78 (3d Cir. 2011).

[12] *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Johnson*, 302 F.3d at 150); *see United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2006).

[13] In moving for a new trial, Defendant "incorporates his arguments" from his Rule 29 motion. Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 23. The Court therefore addresses both motions together.

[14] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 3.

[15] Defendant's business, incorporated under the name "Ice Fire Inc.," is located at 330 South Street, Philadelphia, Pennsylvania.

[16] Second Superseding Indictment [Doc. No. 122] at 4.

[17] Government witness Theodore Vlahakis, a senior compliance officer with FinCEN, testified to the meaning of a nonfinancial business, explaining that it is effectively "any business that is . . . not a financial institution." Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 80 (providing examples such as a "pawn shop," "travel agency," "jewelry shop," and "any store that deals in currency").

$10,000 by filing an IRS/FinCEN Form 8300,[18] and financial institutions are required to report to the federal government currency transactions over $10,000 by filing a Currency Transaction Report ("CTR").[19] Defendant argues that there was insufficient evidence for any reasonable juror to infer knowledge, purpose, or willful avoidance of Defendant's obligation to file a Form 8300 to report a cash transaction of more than $10,000. Defendant further argues that the government improperly "blur[red]" its Form 8300 evidence with its CTR evidence to prove Count 2.[20]

The government presented video evidence of Defendant at his nonfinancial business selling a Rolex watch to the government's confidential source for $29,000 in cash on May 8, 2018.[21] The video showed Defendant plainly stating to the source that "more than ten thousand we gotta report it to IRS,"[22] and proceeding to suggest the following: "That's why if we break the-the price of the watch or just somehow I write up a receipt for diamonds or we write up a receipt that you purchased diamonds and you purchased the watch, purchased labor than [sic] that would make more sense."[23] Defendant further told the source that "because you wanna spe-

---

[18] *See* Trial Tr. Nov. 17, 2022 [Doc. 303] at 79-94; Gov't Ex. 201.

[19] *See* Trial Tr. Nov. 17, 2022 [Doc. 303] at 94-106; Gov't Ex. 302.

[20] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 5.

[21] Gov't Ex. 152.

[22] Gov't Ex. 152-T at 12.

[23] Gov't Ex. 152-T at 12.

spend all this cash in one day. I don't want to write the receipt and get de[/re]ported[24] by IRS."[25] It is undisputed that Defendant never filed a Form 8300 for this transaction.[26]

Accordingly, the Court finds sufficient evidence to support the jury's finding beyond a reasonable doubt that (1) Defendant knew of the requirement for a nonfinancial business to report the receipt of more than $10,000 in cash in one transaction; (2) that on or about May 8, 2018, Defendant knowingly caused or attempted to cause his nonfinancial business not to file a Form 8300 to report a cash transaction of more than $10,000; and (3) Defendant did so for the purpose of evading this reporting requirement.[27]

### B. Counts 3 and 24

Defendant next argues that there is insufficient evidence to sustain the convictions on Counts 3 and 24, which charged structuring of financial transactions and aggravated structuring, in violation of 31 U.S.C. § 5324. With respect to these counts, the Court instructed the jury that under federal law, every domestic financial institution which engages in a currency transaction of over $10,000 must file a CTR with the IRS for that transaction, furnishing the identity and

---

[24] Government Exhibit 152-R was accompanied by a transcript that was displayed below the video. This transcript (which was not formally admitted into evidence) used the word "deported," rather than "reported." Gov't Ex. 152-T at 19. After the jury finished watching Exhibit 152-R, defense counsel noted at sidebar that the transcript said "deported," despite the audio sounding like "reported." Defense counsel ultimately did not request a curative instruction to the jury regarding the asserted transcription error. Trial Tr. Nov. 16, 2022 [Doc. No. 302] at 150-54. Defendant now argues in his post-verdict motion that the error in the transcript is a ground for acquittal. Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 5-6. The Court finds this argument baseless for several reasons: (1) defense counsel failed to request any relief from the Court either during or after the sidebar conference; (2) defense counsel was provided a copy of the transcript in advance of trial; (3) Defendant has failed to show that he was in any way prejudiced by the asserted error; and (4) the Court instructed the jury several times throughout the trial that "[i]f you notice any differences between what you hear in the recordings, and what you read in the transcript, you must rely on what you hear, not what you read or you think you saw on the screen." *See* Trial Tr. Nov. 16, 2022 [Doc. No. 302] at 159.

[25] Gov't Ex. 152-T at 19.

[26] *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 7.

[27] See 31 U.S.C. § 5324(b)(1); Jury Instruction No. 34. The Court finds no merit to Defendant's argument that because Defendant was acquitted on Count 1, he must now be acquitted on Counts 2 and 3. *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 7-8. Each of these counts involves different evidence and findings of fact on the part of the jury.

address of the person engaging in the transaction, the date of the currency transaction, and the amount of the currency transaction.[28] To convict Defendant on these counts, the jury had to find, beyond a reasonable doubt, that (1) Defendant knowingly structured a currency transaction; (2) Defendant knew of the domestic financial institution's legal obligation to report currency transactions in excess of $10,000; and (3) the purpose of the structured currency transaction was to evade this reporting requirement.[29]

Defendant relies on cases from the Second and Seventh Circuits to argue that there is insufficient evidence to support the third prong, which requires an intent on the part of Defendant to evade the CTR requirement.[30] In response, the government cites the testimony of its cooperating witness, Abdul Halimi, who lived with Defendant in 2019 and purportedly "help[ed] [Defendant] with his business."[31] Mr. Halimi testified that Defendant had shown him bank statements displaying consistent cash deposits of amounts between $9,000 and $10,000, and that when Mr. Halimi inquired as to these amounts, Defendant told him, "It's like an American way, it's flying low under the radar because after $10,000 you have to pay taxes . . . it's the American way, everybody does it, you just go under $10,000, it's easy."[32]

Mr. Halimi further testified that Defendant would manufacture his customer's receipts as follows:

> "Like[,] say an individual came and purchased something for $15,000, that individual get his receipt for $15,000. But he would make a receipt for his business at $5,000 maybe. So that would be for his tax records. But the customer

---

[28] Jury Instruction No. 36. Defendant does not dispute that the government presented evidence explaining the CTR reporting requirement.

[29] *See* 31 U.S.C. § 5324(a)(3); Jury Instruction No. 36.

[30] *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 9-14 (citing *United States v. Taylor*, 816 F.3d 12 (2d Cir. 2016); *United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005); *United States v. Davenport*, 929 F.2d 1169 (7th Cir.1991)).

[31] Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 97.

[32] Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 97-98.

always paid for what they got. So they knew how much the original value was, but as long as his receipt for the business was under $10,000, it was okay."[33]

In addition to Mr. Halimi's testimony, the government presented dozens of Defendant's bank records and conducted an extensive direct examination of (among other Government agents) Special Agent Eric Updike, who testified at length to the deposits charged in Counts 3 and 24.[34] The Court notes that Count 3 charged structuring from on or about May 8, 2018 to on or about May 10, 2018.[35] As explained above, Defendant's nonfinancial business received $29,000 in a single cash transaction from the Government's confidential source on May 8, 2018. The government entered into evidence and published to the jury Defendant's bank records showing that after Defendant received the $29,000, he deposited $9,900 on May 9, 2018, and $7,250 on May 10, 2018.[36]

With respect to Count 24, which charged aggravated structuring from on or about March 3, 2016 to on or about November 29, 2018, Defendant contends that the structuring pattern was "interrupted" by the structuring counts on which he was acquitted—namely, Counts 5 through 7, 10 through 15, 17, 19, 21, and 23 ("the Acquitted Counts").[37] According to Defendant, because the deposits charged in the Acquitted Counts were made between March 2016 and November 2018, "[a]ny of the deposits from [the Acquitted Counts] could have served to interrupt any pattern in Count 24."[38]

---

[33] Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 97-98.

[34] *See, e.g.*, Gov't Exs. 300, 300-A, 300-B, 300-C, 501-A, 501-B, 501-C, 501-D, 502-E-1, 502-E-1, 502-E-2, 503, 503-E-1, 503-E-2, 504-E-1, 504-E-2, 505-E-1, 505-E-2, 700; Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 8-65.

[35] Second Superseding Indictment [Doc. No. 122] at 5.

[36] Gov't Exs. 300-B, 300-C; *see* Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 10-15.

[37] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 14.

[38] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 14.

...

Defendant's argument is misguided, as it overlooks the substantial evidence that the Government presented *specifically* with regard to Count 24. For example, after Special Agent Updike testified to each of the roughly seventy deposits charged in Count 24,[39] the jury was presented with a full list of these transactions (Exhibit 600, titled "Count 2[4] – structured deposits of $9,000 to $10,000 in a single day"[40]), which showed that Defendant repeatedly made deposits in the high $9,000s; deposits that, when divided up, fell just below $10,000; and deposits that, when considered in the aggregate, amounted to over $10,000.

Further, as the government notes, Defendant "made cash deposits of between $9,000 and $9,980 at the bank branches in Philadelphia near his store, but other small cash deposits of hundreds of dollars were made on those same days at bank branches in Upper Darby, PA for his tenants' rent that took the total deposits for those days over $10,000."[41] Based on this evidence, the jury permissibly concluded that Defendant committed aggravated structuring by "engag[ing] in a pattern of structured transactions, amounting to more than $100,000 of structured deposits within a 12-month period."[42] The Court therefore finds that the pattern of structured deposits was not, as Defendant suggests, "interrupted," and that the evidence presented at trial supports the jury's verdict of guilty on Counts 3 and 24.

---

[39] Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 8-65; *see, e.g.*, Gov't Exs. 300, 300-A, 300-B, 300-C, 501-A, 501-B, 501-C, 501-D, 502-E-1, 502-E-1, 502-E-2, 503, 503-E-1, 503-E-2, 504-E-1, 504-E-2, 505-E-1, 505-E-2, 700.

[40] Gov't Ex. 600. The Government established on the record that, due to a clerical error, Exhibit 600 was mistakenly titled "Count 20," when it in fact referred to Count 24. *See* Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 63. Accordingly, Exhibit 600 was admitted into evidence as corrected. Trial Tr. Nov. 18, 2022 [Doc. No. 304] at 63.

[41] Gov't Resp. [Doc. No. 290] at 13 (citing Gov't Exhibit 51-B-T (transcript of phone call in which Defendant tells his sister that the other cash deposits ($500 - $600) were from his tenants)).

[42] Jury Verdict Form [Doc. No. 270] at ECF page 9.

### C. Count 4

Defendant next argues that the evidence was insufficient to convict on Count 4, which charged "trafficking in counterfeit goods," in violation of 18 U.S.C. § 2320(a).[43] To find Defendant guilty as to Count 4, the jury had to find, beyond a reasonable doubt, that (1) Defendant trafficked or attempted to traffic in goods or services; (2) such trafficking or attempted trafficking was intentional; (3) Defendant knowingly used a "counterfeit mark" on or in connection with such goods or services; and (4) Defendant knew that the mark so used was counterfeit.[44]

The Court instructed the jury that, to meet the definition of a counterfeit mark, the government was required to prove that (1) the counterfeit mark was not genuine or authentic; (2) the counterfeit mark was identical to or substantially indistinguishable from a genuine mark owned by Rolex; (3) the genuine mark was registered on the principal register in the United States Patent and Trademark Office; (4) the genuine mark had been in use by Rolex; (5) the counterfeit mark was used "on or in connection with" Defendant's goods or services; (6) the counterfeit mark was used "in connection with" the type of goods or services for which the protected mark was registered (i.e. watches and watch parts); and (7) the counterfeit mark was used in a manner "likely to cause confusion, to cause mistake, or to deceive."[45] The Court further instructed the jury that "trafficking" in this case means "to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or to

---

[43] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 17-22; *see* Second Superseding Indictment [Doc. No. 122] at 6.

[44] Jury Instruction No. 45.

[45] Jury Instruction No. 46.

9

make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of."[46]

At trial, the government largely relied on the expert testimony of Ryan Volker, whose qualifications on the authenticity of Rolex watches were not disputed by the defense.[47] On November 12, 2020 and November 13, 2020, Mr. Volker examined a number of Rolex watches seized from Defendant's store and formed conclusions as to whether the watches were "of Rolex manufacture."[48] Defendant now argues that because Mr. Volker never explicitly used the word "counterfeit," neither his report nor his testimony supports a finding of guilt as to Count 4.[49] However, Mr. Volker concluded that *twenty-seven* of the seized watches were "entire[ly] . . . not of Rolex manufacture" and that a number of the other watches comprised at least some parts that were "not of Rolex manufacture."[50] Mr. Volker was not required to use the word "counterfeit," as it is the role of the jury to apply the evidence to the definitions provided by the Court.

Furthermore, the government introduced the expert testimony of Marc Esposito, the National Service Manager for Rolex USA, as to trademarks held by Rolex, including the crown design, and the words "Rolex," "Oyster," "Oyster Perpetual," "DateJust," "Submariner," "Sky-Dweller," "GMT-Master," and "Rolex Daytona."[51] According to Mr. Esposito's testimony, each of the watches or watch parts that Mr. Volker deemed "not of Rolex manufacture" had at least

---

[46] Jury Instruction No. 48.

[47] *See* Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 144-45.

[48] Gov't Ex. 460.

[49] *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 17 (internal citation omitted) ("Nowhere in Mr. Volker's report does he use the word 'counterfeit.' Mr. Volker testified at trial that he never used the word 'counterfeit' in analyzing or drawing conclusions about any watches seized at 330 South Street.").

[50] Gov't Ex. 460.

[51] *See* Gov't Exhibits 401-A – 401-K; Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 176-87.

one counterfeit Rolex mark.[52] Mr. Esposito testified that these watches had "all the hallmarks that . . . would indicate for someone seeing the watch to think that it's a Rolex watch."[53] While Defendant now argues that Mr. Esposito was not qualified to offer such testimony, the government tendered Mr. Esposito as an expert "in the area of Rolex trademarks and also in brand recognition," *without objection* from the defense.[54]

Defendant next argues that evidence of a recorded phone call between Defendant and his sister is similarly insufficient to sustain a conviction for Count 4.[55] During this phone call, which was admitted into evidence and published to the jury, Defendant plainly stated to his sister that "more than a half of the watches in [his] shop are counterfeit."[56] Defendant's post-verdict motion maintains that because Defendant did not specifically identify *which* watches or watch parts are counterfeit, the admission is effectively useless.[57] The jury was entitled to consider the admission along with the other evidence presented, including a text message conversation in which Defendant agreed with his brother-in-law's statement that Defendant "sells pieces of shit Rolexes with fake bracelets and after-market dials to . . . people for profit."[58] Additionally, the Government presented evidence of email chains between Defendant and sellers of watches/watch bands, wherein the sellers stated, in part, the following:

- "Because it is your first payment on DHgate.com, the DHgate.com has just investigated your payment to confirm whether it is safe. Please . . . tell them it is

---

[52] Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 195-97.

[53] Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 196.

[54] Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 174.

[55] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 17-18.

[56] Gov't Ex. 50-A-T.

[57] *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 17-18.

[58] Gov't Exhibit 20-E at 24898.

> the payment for the watch bands indeed, *but do not tell them there are the Rolex logo on them*."[59]

- "There are total 20 pcs watchbands *marked Rolex logo* for your new order[.]"[60]

- "*The factory* for the new style 20 mm steel oyster and jubilee watch bands are shutting down now because their city is checking environmental protection *by Chinese central authorities*[61] official very seriously now. So that they have been forced to close[.]"[62]

- "Do you want to buy the new style of steel jubilee watch bands with Rolex hidden clasps and 20 mm solid curved end pieces *with normal or higher qualities*?"[63]

- "I wonder if you will accept the steel polished center oyster watch band to try also. The cost for the rest items in your new order is as the list below[:]
    a. 2 pcs 20mm 10k gold filled 2-tone jubilee watch bands with separated end pieces and rolex folding clasps~~72x2=$144
    b. 2 pcs 20mm steel jubilee watch bands with separated curved end pieces and rolex folding clasp~~25x2=$50
    c. 2 pcs ladles 13mm 10k 2-tone jubilee watch bands with separated end pieces and rolex folding clasp~~70X2=$140"[64]

Defendant engaged in back-and-forth communications with these sellers, seeking to purchase patently fake Rolex watches and watch parts for his store. Indeed, Defendant replied, "Yes that's fine" to one of the messages, where the seller asked Defendant if he wanted to purchase watch bands with "rolex folding clasp[s]" for less than $75 each.[65] Accordingly, the Court finds that the jury was presented with ample evidence to determine that Defendant knowingly and intentionally trafficked or attempted to traffic in counterfeit goods, and that they

---

[59] Gov't Exhibit 20-E at 12598 (emphasis added).

[60] Gov't Exhibit 20-E at 12600 (emphasis added).

[61] The Government presented evidence to the jury establishing that all genuine Rolex watches are manufactured in Switzerland. *See* Trial Tr. Nov. 17, 2022 [Doc. No. 303] at 175.

[62] Gov't Exhibit 20-E at 12644 (emphasis added).

[63] Gov't Exhibit 20-E at 13258 (emphasis added).

[64] Gov't Exhibit 20-E at 13824.

[65] Gov't Exhibit 20-E at 13824.

were free to so find.[66]

### D. All Counts

Finally, Defendant asserts that with respect to all counts, the verdict was "based on [a] theory of liability on which [the] jury [was] not instructed."[67] In support of his position, Defendant argues the following grounds:

- "Count Four was based on a theory of liability that if Mr. Hadjiev generally knew about counterfeits in the store, that he knew that the *specific* watches and watch parts in Mr. Volker's report (which does not use the word "counterfeit") were counterfeit."[68]

- "[D]efendant was convicted of structuring on a theory that, by picking and choosing deposits over a three year period, the jury could find a 'pattern' even where there were deposits in a single day that exceeded $10,000."[69]

- "[T]he government relied heavily on theories of liability that were really based on tax evasion laws, and not the actual counts of conviction."[70]

These arguments are without merit for the reasons discussed above. Moreover, Defendant has not identified errors in the jury instructions, and the Third Circuit "presume[s] that jurors follow the instructions given to them by the trial court."[71] "That presumption is only overcome where there is an 'overwhelming probability' that the jury was unable to follow the instructions and a likelihood that the evidence wrongfully admitted was 'devastating' to the other party.'"[72]

---

[66] Based on the evidence described above, it was certainly rational for the jury to reject Defendant's position that the counterfeit watches were only "samples" and were "not for sale." The Government presented evidence that a number of the counterfeit watches were displayed throughout the store and in the front window displays, further negating Defendant's claim that these watches were not for sale. It is also worth noting that there is no evidence to suggest that Defendant treated the nongenuine watches any differently (for example, with lesser care) than those that comprised all genuine parts. *See* Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 18.

[67] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 22 (capitalization modified).

[68] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 22 (emphasis in original).

[69] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 22-23.

[70] Def.'s Mot. Acquittal and/or New Trial [Doc. No. 279] at 23.

[71] *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir. 2019) (citing *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014)).

[72] *Id.* (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

Defendant offers no factual support for his argument that the jury failed to follow the instructions provided by the Court, nor has he shown that any evidence was improperly admitted.

### III.     CONCLUSION

Upon careful consideration of all of the arguments raised by Defendant, and for the reasons stated above, the Court is satisfied that Defendant received a fair trial and that evidence was properly admitted and sufficient to sustain the convictions beyond a reasonable doubt. The motion for judgment of acquittal and/or a new trial will be denied. An appropriate order follows.